T.C. Memo. 2011-261

UNITED STATES TAX COURT

PERRY W. BROWNING, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3531-08.                    Filed November 3, 2011.

In December 1995, P, the principal shareholder,
president, and CEO of SBE, a Vermont-based
manufacturing corporation, on the advice of its
promoters and his own tax adviser, entered into an
offshore employee leasing (OEL) arrangement whereby he
agreed to lease his services to T, an Irish corporation
that subleased his services to L, a U.S. employee
leasing company that subleased his services back to
SBE.  During the audit years (1995-2000), in
consideration of P's services, SBE paid L annual
amounts equivalent to what SBE had paid P as wages in
prior years.  L paid a portion of those amounts to P,
who reported those payments as wages.  L remitted the
balance, after deducting certain amounts, including the
payroll taxes owed with respect to its payments to P,
to T for deposit in a deferred compensation or
retirement account for P's benefit (the retirement
account).  The retirement account was opened in the
name of a Bahamas subsidiary of T.  P and his wife
received and used, during 1998-2000, credit cards

issued by a Bahamas bank and backed by an account at the same bank in the name of the T subsidiary. Money from P's retirement account funded the bank account used to pay the credit card charges, many of which P recognized were personal. During all of the audit years, P continued to represent himself to third parties as an employee and president of SBE, and he acted on behalf of SBE in the same manner as before adoption of the OEL arrangement. He also determined the amounts to be deposited in the retirement account and he effectively controlled the manner in which the assets in the account were invested. During 1998-2000, he exercised his unrestricted access to the funds in the account by means of the Bahamas bank credit cards.

Both the 3- and 6-year periods of limitations on assessment under I.R.C. sec. 6501(a) and (e) had expired before R issued the notices of deficiency (the notices) to P. R alleges that the notices were timely issued by reason of the application of I.R.C. sec. 6501(c), which permits assessment of tax at any time in the case of a false or fraudulent return. R also alleges that, for all open audit years, P (1) underreported his income, (2) is liable for the I.R.C. sec. 6663 fraud penalty, and (3) alternatively, is liable for the I.R.C. sec. 6662 accuracy-related penalty.

1. Held: For all audit years, P was in constructive receipt of (1) amounts equal to the excess of SBE's payments to L for his services on behalf of SBE over the sum of the amounts he reported as wages plus the employer portions of the Social Security and Medicare taxes that L paid with respect to those reported wages and (2) the capital gains and investment income generated by the assets in the retirement account.

2. Held, further, P's 1998-2000 returns were fraudulent by reason of P's concealment of the Bahamas bank account and associated credit cards by means of which he had, and intended to exercise, his unrestricted access to the constructively received amounts described in holding 1., supra.

3. Held, further, P's 1995-97 returns were not fraudulent with the result that R's determinations and adjustments regarding those years are barred.

4.  Held, further, P is subject to the I.R.C. sec. 6663 fraud penalties for 1998-2000 with respect to all the constructively received amounts described in holding 1., supra.

5.  Held, further, because we apply the I.R.C. sec. 6663 fraud penalties to P's total underpayments for 1998-2000, the I.R.C. sec. 6662 accuracy-related penalties do not apply for those years. See I.R.C. sec. 6662(b) (flush language).

John M. Colvin and Robert J. Chicoine, for petitioner.

Carina J. Campobasso and Robert W. Dillard, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By two notices of deficiency dated January 3, 2008 (the notices), respondent determined joint deficiencies in income taxes and related penalties for petitioner and his wife, Nancy L. Browning (Mrs. Browning), as follows:

| Year | Deficiency | Penalty Sec. 6663 |
|------|-----------|-------------------|
| 1995 | $142,489 | $106,867 |
| 1996 | [1]71,747 | [1]53,810 |
| 1997 | 54,166 | 40,625 |
| 1998 | 6,336 | 4,752 |
| 1999 | 11,514 | 8,636 |
| 2000 | 53,275 | 39,956 |

[1]The deficiencies for all of the years are primarily attributable to the difference between what petitioner's corporation, S B Electronics (SBE) deducted as payment for petitioner's services and the wages petitioner reported.  By an amendment to amended answer, respondent asserted an increased deficiency for 1996 of $82,200 and a sec. 6663 fraud penalty of $61,650.  Those increased amounts relate to $25,394 of reported wages earned by either petitioner or

Mrs. Browning that the agent mistakenly attributed to a source other than SBE.

Petitioner and Mrs. Browning (sometimes, the Brownings) filed separate petitions to this Court in response to the notices, and Mrs. Browning's case received its own number, docket No. 6922-08. Because the parties in docket No. 6922-08 filed a stipulation to be bound by any deficiency redetermined in this case, we decided not to consolidate the two cases, and we consider herein only petitioner's case.[1]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

The issues for decision are (1) whether the notices for one or more of the years 1995-2000 (the audit years) were timely issued by reason of the application of section 6501(c)(1), which provides for assessment of tax at any time in the case of a false or fraudulent return, and, if so, whether petitioner (2) had additional, unreported wages for one or more open audit years comprising all or a portion of the excess of the amounts SBE paid to a leasing company for his services over the amounts petitioner

---

[1]In the stipulation, respondent concedes that the fraud penalty "does not apply" to Mrs. Browning for any of the audit years.

reported as wages received from the leasing company; (3) had additional, unreported capital gains for one or more open audit years that were generated by an alleged deferred compensation account; (4) had additional unreported dividends for 1999 and 2000 (if open) that were generated by the alleged deferred compensation account; (5) as an alternative to issues (2) through (4), had additional, unreported income for 1998-2000 (if open) arising out of petitioner's and Mrs. Browning's charges to a credit card that were paid from the alleged deferred compensation account referred to in issues (3) and (4); (6) is liable for the section 6663 fraud penalty for one or more open audit years; and (7) as an alternative to issue (6), is liable for the section 6662 accuracy-related penalty for one or more open audit years.[2] If we decide for petitioner with respect to issue (1), then respondent is time barred from raising any of the other issues, and we must decide the case in petitioner's favor.[3]

---

[2]There are also certain computational adjustments that follow from the adjustments at issue, but they are not in controversy and we need not discuss them.

[3]Both the general 3-year limitations period on assessments provided by sec. 6501(a) and the 6-year limitations period on assessments provided by sec. 6501(e)(1) in the case of substantial omissions from gross income (which was potentially applicable to 1995-97 and 2000) had expired for all of the audit years by Jan. 3, 2008, both notices' date of issuance.

FINDINGS OF FACT

Introduction

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

At the time he filed the petition, petitioner resided in Florida.

Petitioner's Education and Work Experience

Petitioner graduated from the University of Maryland with a bachelor of science degree in industrial management.  After graduation, he worked, in both technical and sales positions, for E.I. Dupont.  In 1969, he left E.I. Dupont and went to work for Sprague Electric Co. (Sprague), a manufacturer of electronic components, in Barre, Vermont.  Petitioner worked for Sprague in a number of managerial positions, including plant manager, until 1985 when he founded S B Electronics (SBE).  He purchased for SBE one of Sprague's operating divisions (Sprague had decided to close its Barre plant), which SBE (like Sprague, an electronic components manufacturer) continued to operate in Barre.

While at Sprague, petitioner attended the University of Vermont part time to pursue an MBA degree.  He enrolled in some accounting courses but dropped out of the program because of his inability to become a full-time student.  In 1982, he participated in a management development program at the

University of New Hampshire.  He has never taken any tax courses, and he has little familiarity with tax law.

Petitioner was the principal owner, president, and CEO of SBE from 1985 through June 2002 when he sold the company's assets to a new company owned, in part, by one of his sons.  SBE was organized as an S corporation and, at its peak, employed 60 to 70 persons.  Mrs. Browning and the five Browning children were minority shareholders of SBE.  Petitioner is also a part owner and director of Dearborn Electronics in Longwood, Florida.

Petitioner's Relationship With Viggo Carstensen

Petitioner's primary tax adviser has been his longtime accountant, Viggo Carstensen (Mr. Carstensen).  Mr. Carstensen, a Canadian by birth, worked for Air Canada for 25 years, first in Canada and, beginning in 1973, in the United States, eventually becoming that company's head of human resources for the United States.  After retiring from Air Canada in 1985, Mr. Carstensen purchased a franchise of General Business Services (GBS), through which he entered the tax preparation and business consulting fields for clients in central Vermont.  Before the advent of reliable tax preparation software, GBS franchisees like Mr. Carstensen's obtained the relevant information from clients and sent it to the GBS office in Rockville, Maryland, for actual return preparation.  Mr. Carstensen's primary function was to help his small business clients create recordkeeping systems to

enable them to track income and expenses and become more profitable. When the tax preparation software improved, Mr. Carstensen learned more about taxes and assumed the tax preparation function on behalf of his clients. He also passed the enrolled agent's exam and began representing clients before the Internal Revenue Service (IRS). Sometime later, he joined H.D. Vest Investment Securities, Inc. (HD Vest), a registered broker-dealer that used certified public accountants and tax advisers to market its investment products, as a licensed or registered investment representative/adviser.

Petitioner met Mr. Carstensen at a seminar both attended as new business owners in connection with their each obtaining a Federal ID number, petitioner for SBE and Mr. Carstensen for his GBS franchise. The seminar provided information with respect to a new business owner's employment tax and information reporting obligations.

Initially, petitioner retained Mr. Carstensen to install a system for keeping records that would form the basis for SBE's financial statements and to prepare quarterly and annual payroll reports. After he joined HD Vest, Mr. Carstensen became an investment adviser to and account representative for petitioner and Mrs. Browning. Mr. Carstensen also prepared all of petitioner and Mrs. Browning's individual tax returns, going back

at least to 1990, and all of SBE's corporate returns for the audit years.

## Petitioner's Decision To Engage in a Deferred Compensation/ Offshore Leasing Plan

The years 1994-96 were peak profit years for SBE. However, the company was beginning to lose its largest customer to foreign competition. That customer accounted for at least 50 percent of SBE's sales. Recognizing that SBE was in the midst of its most profitable period, petitioner sought a means to defer receipt of a portion of those profits until his retirement. In response to that concern, petitioner's estate planning advisers, to whom he had been referred by Mr. Carstensen, suggested that he meet with Jim Schmidt (Mr. Schmidt), a Florida attorney. One of those advisers referred to Mr. Schmidt as professing to have a state-of-the-art plan in the areas of estate planning and deferred compensation.

In the fall of 1995, petitioner and Mr. Carstensen met with Mr. Schmidt and another attorney, Tom Drysdale (Mr. Drysdale), who worked with Mr. Schmidt. During that meeting, Messrs. Schmidt and Drysdale gave petitioner and Mr. Carstensen various handouts, charts, and other related materials, including a legal analysis, which described an offshore employee leasing plan (OEL plan or program) as follows: (1) Petitioner enters into an employment contract with an Irish corporation (Irish corporation), pursuant to which, in exchange for petitioner's

services, Irish corporation agrees to (a) pay petitioner's business expenses facilitated by the issuance of an offshore credit card to petitioner, (b) pay petitioner "a relatively modest current salary" for his services, and (c) provide "an attractive salary deferral program"; (2) Irish corporation, for a fee, subleases petitioner's services to a U.S. employee leasing company (U.S. leasing company), which, for a larger fee, subleases petitioner's services to SBE; (3) out of its fee, U.S. leasing company pays petitioner a salary, provides him with taxable and nontaxable fringe benefits, and discharges the payroll tax obligations with respect to his salary, all pursuant to its agreement with Irish corporation; and (4) out of its fee from U.S. leasing company, which it receives tax free pursuant to the United States-Ireland income tax treaty, see infra note 6, Irish corporation creates, funds, and administers a nonqualified (under U.S. law), offshore deferred compensation account or trust for petitioner's benefit in its (or a subsidiary's) name. The assets in the account are subject to the claims of the Irish corporation's (or the subsidiary's) creditors.

Petitioner and Mr. Carstensen recognized that the principal tax benefit of the OEL plan, as compared with petitioner's existing status as a direct employee of SBE, was SBE's ability to treat the amounts paid to U.S. leasing company as a currently deductible business expense while petitioner avoided tax on the

amounts set aside in the deferred compensation account until paid to him upon his retirement from SBE.

The written materials that Messrs. Schmidt and Drysdale presented to petitioner and Mr. Carstensen represented that the OEL plan was largely predicated on IRS revenue rulings (Rev. Rul. 74-330, 1974-2 C.B. 278, and Rev. Rul. 74-331, 1974-2 C.B. 281) that discuss the tax aspects of employee loan-out programs in the entertainment industry. Those materials also stressed that the program must be both structured and implemented so as to avoid falling within U.S. caselaw in which the employee leasing arrangement (e.g., of an athlete "leased" to his team) was not respected for tax purposes.

Although both petitioner and Mr. Carstensen were very impressed by Messrs. Schmidt and Drysdale, Mr. Carstensen decided to seek a second opinion from a former vice president for tax at GBS who was then in private practice, Jim McCarthy (Mr. McCarthy).[4] On October 12, 1995, he sent Mr. McCarthy the promotional materials that had been furnished by Messrs. Schmidt and Drysdale. Thirteen days later, Mr. McCarthy gave his response, in which he expressed a number of misgivings regarding the efficacy of the OEL plan: (1) The promoters' failure to either obtain an IRS ruling or guarantee the payment of penalties

---

[4]The record does not indicate whether Mr. McCarthy was either (or both) an attorney or a certified public accountant, only that he was "a very knowledgeable individual within GBS."

and interest that might result from the very real possibility of a successful IRS challenge to petitioner's and/or SBE's tax position, (2) the OEL plan "is geared toward" personal service providers such as "entertainers, athletes, attorneys, doctors, accountants, engineers, etc.; those that would fall into the Personal Service Corporation category if incorporated", and (3) in contrast, petitioner "would still be working solely as the head of his manufacturing facility * * * His relationship with his controlled corporation would not change, except on paper." Mr. McCarthy viewed those distinctions as possibly providing the IRS "with a telling argument against * * * [petitioner]." Lastly, Mr. McCarthy noted that, for the OEL plan "to have any chance of deferring tax on the foregone compensation, * * * [petitioner] must be at risk for that amount with no guarantee of receipt." Mr. McCarthy feared that "if the Irish company goes under, * * * [petitioner] would lose all."

Mr. Carstensen considered Mr. McCarthy's advice as a warning that the IRS might challenge the OEL plan, not as a warning that it was either illegal or improper.

In December 1995, after further discussions with Mr. Carstensen and his estate planning advisers, petitioner decided to implement the OEL plan.

Implementation of the OEL Plan

Beginning in December 1995, petitioner, with Mr. Carstensen's assistance and under Mr. Schmidt's guidance, took various steps that were intended to implement the OEL plan as it had been described by Messrs. Schmidt and Drysdale. That month, pursuant to Mr. Schmidt's instructions, petitioner and Mr. Carstensen traveled to Canada where petitioner signed (1) an employment agreement with an Irish corporation,[5] (2) on behalf of SBE, an agreement between SBE and U.S. leasing company, and (3) an SBE check for $500,000, made out to TransNational, and mailed all three to TransNational at a Dublin, Ireland, address.[6] The

---

[5]The record does not reveal the identity of the Irish corporation with which petitioner contracted. Whereas both petitioner and Mr. Carstensen believe it to have always been TransNational Leasing Co. (TransNational), there is evidence that it was Montrain Services, Ltd., which, later, was replaced by TransNational. Also, the parties appear to agree that at least three U.S. leasing companies were involved in purportedly implementing the OEL plan during the audit years. Because it is the nature or substance of each entity's participation in the execution and implementation of the plan that is germane to the legitimacy of the plan and the issue of fraudulent intent rather than its name or identity, we will not address the latter issue. We will refer to the Irish corporation as the Irish company or as TransNational, which respondent appears to acknowledge did, in fact, become the purported participating Irish corporation as of December 1997, and we will generally refer to the U.S. leasing company as U.S. leasing company.

[6]Presumably, Mr. Schmidt's reason for requiring petitioner to execute and mail documents to TransNational from outside the United States was, in what appears to be an excess of caution, to assure that the transaction would not endanger TransNational's assumed treaty exemption from United States income taxation. See Convention for the Avoidance of Double Taxation and the

(continued...)

$500,000 payment was used, in part, to initially fund the deferred compensation account.

On its Forms 1120S, U.S. Income Tax Return for an S Corporation, filed for the audit years, SBE deducted, as part of its "other deductions" on line 19, "Employee Leasing Program" expenses, and petitioner reported, as wages from the various U.S. leasing companies, by name, the following amounts:

| Year | SBE Deductions | Petitioner's Reported Wages From U.S. Leasing Company |
|------|----------------|------------------------------------------------------|
| 1995 | $500,000 | $150,000 |
| 1996 | 348,342 | 150,000 |
| 1997 | 269,254 | 150,000 |
| 1998 | 99,627 | 86,000 |
| 1999 | 70,958 | 54,500 |
| 2000 | 107,950 | -0- |

The differences between the amounts SBE deducted as employee lease payments and the amounts that petitioner reported as wages (after the deduction of various fees payable to TransNational and U.S. leasing company, taxes, and health insurance premiums, which totaled $163,463 during the 1995-2002 existence of the OEL program) were deposited in an account with HD Vest in Irving, Texas, in the name of TransNational Leasing Capital Management Ltd. (TLCM) (the HD Vest account).

---

[6](...continued)
Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, U.S.-Ir., art. 7, July 28, 1997, U.S. Tax Treaties (CCH) par. 4401 (providing, in effect, that the business profits of an Irish enterprise are not taxable in the United States unless those profits are attributable to a United States "permanent establishment").

The amounts deposited in or withdrawn from the HD Vest

account were as follows:

| Year | Deposits | (Withdrawals)[1] |
|---|---|---|
| 1996 (Feb.)[2] | $303,963 | --- |
| 1996 (Dec.)[2] | 158,346 | --- |
| 1997 | --- | --- |
| 1998 | 85,420 | ($15,416) |
| 1999 | --- | (95,528) |
| 2000 | --- | (70,541) |
| 2001 | 94,439 | (63,389) |
| 2002 | --- | (116,477) |
| 2003 | --- | (218,090) |

[1]With two exceptions, all of the withdrawals were used
to pay the charges to the credit cards issued in connection
with the HD Vest account. Those exceptions were (1) $31,000
refunded to SBE in 2002 and (2) the $218,090 final
distribution to petitioner in 2003.

[2]The February 1996 deposit was taken from the $500,000
that petitioner mailed to Ireland in December 1995. The
December 1996 deposit, like the subsequent deposits, was
derived from an SBE payment to U.S. leasing company and a
U.S. leasing company payment to TransNational (or TLCM) for
the year of deposit.

During the 1996-2000 period, the HD Vest account earned

capital gains in excess of $195,000 and investment income of

$1,299. It also incurred investment expenses of $48,062.[7]

TLCM was a corporation organized under the laws of the

Bahamas. Jeremy Cafferata (Mr. Cafferata), a Bahamas resident,

was president of and acted on behalf of TLCM. Mr. Cafferata

appointed Mr. Carstensen as the account representative or

[7]Total deposits plus capital gains and investment income
exceeded total withdrawals plus expenses because the account
realized a $62,727 investment loss during its existence.

executive for the HD Vest account.  Mr. Cafferata billed petitioner through Mr. Carstensen for his services with respect to the account and the credit cards (discussed infra) issued in connection therewith.

Mr. Cafferata and the people in Texas handling the HD Vest account routinely acquiesced to petitioner's wishes regarding the movement of funds within and the withdrawal of funds from the account.  Moreover, even though the account was in TLCM's name and, therefore, subject to its creditors, if any, petitioner recognized that the money in the account was being held for his benefit alone and that it was his money.  Petitioner also assumed that he could terminate the program at any time and have the funds in the account returned to him.

The HD Vest account was opened in February 1996, and the last reported activity, including the final distribution to petitioner, occurred in May 2003.

As part of the implementation of the OEL plan, U.S. leasing company handled petitioner's payroll taxes and provided for his health insurance, tasks that SBE had previously performed. Throughout the audit years, however, petitioner continued to identify himself to non-payroll-department employees of SBE, to customers of SBE, to financial institutions, and even to Mrs. Browning as president of and as an employee of SBE.  Moreover, in 1997 and 1999, on various applications to open an IRA or other

financial accounts, petitioner listed SBE as his employer and himself as either "president" or as "president and CEO" of SBE.

The contractual relationships among petitioner, SBE, TransNational and U.S. leasing company are uncertain. The contracts that petitioner executed in Canada and mailed to Ireland either were never returned to petitioner or, if returned, were discarded or lost after the sale of SBE in June 2002. Petitioner did retain sample or draft contracts, which may have been provided during the initial presentation of the OEL plan by Messrs. Schmidt and Drysdale. Assuming the sample or draft employment contract between petitioner and TransNational generally reflected the intended or actual contractual relationship between the parties (which petitioner believed to be the case), petitioner remained unaware of its actual terms so that his compliance with any specific term would have been coincidental.

In practice, even after adopting the OEL plan, petitioner continued to act on behalf of SBE just as he had before participating in the plan. The only significant changes were (1) the substitution of U.S. leasing company for SBE in the handling of his salary, fringe benefits, and payroll taxes, and (2) the diversion, through U.S. leasing company and TransNational, of what previously had been part of his wages to the HD Vest account. No employee of TransNational exercised any direction

and/or control over petitioner's services and no employee of TransNational was ever known to him. His only "contact" was Mr. Schmidt, who was the creator and promoter of and petitioner's informal adviser with respect to the OEL program, but who was not an officer or employee of TransNational exercising any supervision over petitioner.

Petitioner and Mr. Carstensen agreed with Messrs. Schmidt and Drysdale that the annual amount to be placed in the deferred compensation account would be a formulary amount based upon SBE's annual profits, but, in practice, petitioner unilaterally decided on the annual amount to be placed in the account. When, in 2002, petitioner determined that SBE's business needs required additional cash, he authorized a transfer of funds from the HD Vest account back to SBE, the funds to be reported as additional income by SBE.

Leadenhall Bank Credit Card

In 1998, either Mr. Schmidt or Mr. Drysdale advised petitioner and/or Mr. Carstensen that they were able to issue a credit card to petitioner in connection with the OEL program for his use in defraying business expenses. Use of a credit card had been an anticipated feature of the OEL program from its inception. Thereupon, in May 1998, petitioner was issued a credit card by Leadenhall Bank and Trust Company, Ltd., a Bahamas company (Leadenhall Bank and Leadenhall Bank credit card), and an

HD Vest checking account at that bank (the Leadenhall Bank account) was created to pay the credit card charges, funds to be obtained from the assets in the HD Vest account. Initially, Mr. Cafferata (at petitioner's request) caused $10,000 to be moved from the HD Vest account to the Leadenhall Bank account to secure charges to the Leadenhall Bank credit card. That security account was opened in the name of "TransNational Leasing c/o Cafferata & Co." Mr. Cafferata had signature authority with respect to that account. Petitioner arranged for Mrs. Browning to receive a Leadenhall Bank credit card in 1999. He did not explain to her the circumstances of the issuance of the card, nor did he place any restrictions on her use of the card.

During the period from May 1998 through September 2002, petitioner and Mrs. Browning charged over 2,000 items to the Leadenhall Bank credit card. During that period, over $330,000 was transferred from the HD Vest account to pay petitioner's and Mrs. Browning's credit card charges and associated expenses. A substantial portion (and in Mrs. Browning's case, the overwhelming majority) of those charges was considered by petitioner to be personal, which, to him, meant unrelated to SBE's business.[8] During the 3 audit years in which petitioner

---

[8]The draft employment contract between the Irish company employer and petitioner that Mr. Schmidt left with petitioner provides for the issuance of a credit card to petitioner, but it limits the use thereof to "corporate [presumably referring to the
(continued...)

and Mrs. Browning used the Leadenhall Bank credit cards (1998-2000), their charges to those cards totaled $128,734 ($14,919, $57,274, and $56,541 for 1998-2000 respectively). Of that amount, $58,621 ($9,621, $29,503, and $19,390 for 1998-2000 respectively) constituted expenditures that petitioner considered personal.[9] For those same 3 years, the following amounts were withdrawn from the HD Vest account to pay credit card charges

---

[8](...continued)
Irish company employer, not SBE] business expenses", all of which are subject to the employer's approval and to its "prior written approval" for expenses exceeding $250. Those conditions were routinely ignored by petitioner and Mrs. Browning in connection with their use of the Leadenhall Bank credit cards issued to them.

[9]For 1999 and 2000, we accept as recognized personal charges the charges petitioner listed as personal on a 2003 submission to respondent's agent, Belinda Evans (Ms. Evans), who audited petitioner's 1995-2000 returns. Although there are discrepancies regarding the description of a particular charge as personal or as business between that submission and a 2008 submission to Ms. Evans covering Nov. 27, 1998, through Sept. 16, 2002, we accept as an accurate reflection of what petitioner considered to be personal charges for 1999 and 2000 the earlier submission because it is 5 years closer to those years. For the period from Nov. 28, 1998, to 1998 yearend, we accept as what petitioner considered to be personal charges the charges petitioner identified as personal on the 2008 submission as it constitutes petitioner's only analysis of his and Mrs. Browning's credit card expenditures during that period that is in evidence. The record also contains Leadenhall Bank statements reflecting their credit card usage for June-August and part of September 1998. All but a very few of the charges reflected on those statements clearly are personal, and those few are, at best, ambiguous. In the absence of evidence to the contrary we have treated all of the credit card charges listed on those 1998 statements as charges petitioner would consider personal. Also, because there is no evidence to the contrary, we have assumed that for the rest of 1998 (January-May and Oct. 1-Nov. 26) the Brownings either did not have Leadenhall Bank credit cards or did not use them.

"and Other Bahamian Fees": 1998, $15,416; 1999, $95,528; and 2000, $70,541. Petitioner has never reported and paid tax on any amount attributable to his or Mrs. Browning's use of the Leadenhall Bank credit cards for what they considered personal expenditures.

Copies of the Leadenhall Bank credit card statements were faxed to Mr. Carstensen, who retained and furnished them to respondent during the audit and the litigation of the case. Petitioner did not review those statements with Mr. Carstensen to determine business versus personal expenditures in connection with the preparation of his income tax returns.

Line 7a of Schedule B, Interest and Ordinary Dividends, of the 1998-2000 Form 1040, U.S. Individual Income Tax Return (sometimes, just Line 7a), asks:

> at any time during * * * [the taxable year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?

On their joint returns for 1998-2000, the Brownings answered "no" to that question.

Termination of the OEL Program

After SBE's assets were sold, on June 30, 2002, to a new corporation owned, in part, by one of petitioner's sons, petitioner and Mrs. Browning retired to Florida. In May 2003, the remaining investments in the HD Vest account were sold and,

on May 23, 2003, the asset remaining in the account ($218,090 in cash) was withdrawn from the account and distributed to another account with HD Vest that petitioner and Mrs. Browning maintained.

The Audit

By letter dated June 19, 2002, respondent commenced an audit of petitioner and Mrs. Browning's 1999 and 2000 joint returns.[10] The agent, Belinda Evans (Ms. Evans), attached to that letter a Form 4564, Information Document Request (IDR), requesting, among other items, the following information regarding petitioner's credit card use during 1999 and 2000:

> List of all credit * * * cards, foreign or domestic,
> under any name, used by you to make purchases * * * or
> to pay expenses for any purpose, including personal or
> business use, during the [audit] year(s) * * *.

In response to that request, petitioner, through Mr. Carstensen, provided only a credit report that did not list the Leadenhall Bank credit card. It was not until Ms. Evans met with Mr. Carstensen on August 14, 2002, and told him she was aware of

---

[10]The record does not indicate when the audit was expanded to encompass petitioner and Mrs. Browning's 1995-98 taxable years. The parties stipulate that each of the returns for those years was timely filed on or about Apr. 15 of the following year, which means that the normal 3-year limitations period on assessments, under sec. 6501(a), for each of those years, had expired before the June 19, 2002, commencement of the audit. The record also does not indicate why respondent failed to obtain from petitioner agreements to extend the 3-year limitations period on assessments for 1999 and 2000 pursuant to sec. 6501(c)(4).

that credit card that the latter acknowledged its existence and explained its connection with the OEL program, which, until that moment, he also had not described to Ms. Evans.

In the 2003 analysis of credit card charges submitted to Ms. Evans (see supra note 9), petitioner breaks down the charges not listed as "personal" as follows:  $16,377 is listed as "ATM" charges and $10,662 as "meals/entertainment".  The balance (or some 33 percent of the total) petitioner attributes to "computer/office", "business gifts", "charitable", "dues/[sub]scription", "travel auto", and "prod sup/oper supplies".  Petitioner was unable to identify what portion, if any, of the "ATM" charges he considered business related, and he did not retain any records that might have substantiated as business expenses one or more of the listed "meals/entertainment" expenses in accordance with the requirements of section 274(d) and the regulations thereunder.

The 2008 analysis of credit card charges (also submitted to Ms. Evans--see supra note 9) covered charges to the Leadenhall Bank credit card from November 27, 1998, through September 16, 2002.  That analysis broke down the charges between business and personal with a separate column describing the nature of the alleged business charges.  The vast majority of the business-denominated expenses were stated to be for travel (including "auto") and entertainment for which no section 274(d)

substantiation was provided.  As stated supra note 9, there are a number of inconsistencies between the 2003 and 2008 analyses of credit card charges in that many of the items listed as business expenses on one were listed as personal expenses on the other. Moreover, on the 2008 analysis petitioner classified 30 of the 55 charges made after he sold SBE on June 30, 2002, as business expenses.

OPINION

## I.  Application of Section 6501(c)(1)

### A.  Introduction

Section 6501(a) provides, generally, that the amount of any tax must be assessed within 3 years of the filing of a return. Pursuant to section 6501(c)(1), however, if a taxpayer files "a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time."

Respondent argues that the income taxes due from petitioner for the audit years may be assessed at any time pursuant to section 6501(c)(1) "because petitioner knowingly filed false or fraudulent income tax returns for said years with intent to evade tax."  Alternatively, respondent argues that Mr. Carstensen, on behalf of petitioner, acted with the requisite fraudulent intent in his preparation and filing of petitioner's returns for the audit years.  He cites Allen v. Commissioner, 128 T.C. 37, 40-42 (2007), which holds that an underreporting of taxes attributable

to the return preparer's (rather than the taxpayer's) fraud is sufficient to invoke the application of section 6501(c)(1). Petitioner disagrees with both arguments.

B. Proof of Fraudulent Return

1. Introduction

Respondent must establish by clear and convincing evidence that petitioner filed false and fraudulent returns with the intent to evade tax. See sec. 7454(a); Rule 142(b); Botwinik Bros. of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). Respondent's burden of proof under section 6501(c)(1) is the same as that imposed under section 6663, which provides for the imposition of a civil fraud penalty. See Pennybaker v. Commissioner, T.C. Memo. 1994-303. To satisfy that burden, respondent must prove (1) that an underpayment exists and (2) that fraud exists, i.e., that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). Respondent must prove both of those elements of fraud by clear and convincing evidence. See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Richardson v. Commissioner, T.C. Memo. 2006-69, affd. 509 F.3d 736 (6th Cir. 2007). The existence of fraud is a question of

fact to be resolved from the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Respondent must meet his burden through affirmative evidence because fraud is never imputed or presumed.  See Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Petzoldt v. Commissioner, supra at 699; Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  Once respondent has produced sufficient evidence to establish that any portion of petitioner's underpayment was due to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion thereof that petitioner establishes, by a preponderance of the evidence, is not attributable to fraud.  See sec. 6663(b).  The entire taxable year remains open under section 6501(c)(1) even if only a part of the deficiency for a year is attributable to fraud.  Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32.  "Thus, where fraud is alleged and proven, respondent is free to determine a deficiency with respect to all items for the particular taxable year without regard to the period of limitations."  Colestock v. Commissioner, 102 T.C. 380, 385 (1994).

> 2.  Underpayment of Tax

> a.  Introduction

The first element necessary for finding a fraudulent return under section 6501(c)(1) (or fraud under section 6663(a)) is an

underpayment of tax.  Section 6664(a) defines an "underpayment" for purposes of section 6663 (with exceptions not here relevant) essentially as a "deficiency" as defined by section 6211.  As applicable herein, that is the amount by which the tax imposed by the Internal Revenue Code exceeds the amount shown as the tax by petitioner on his return.

### b.  The Parties' Arguments

Although respondent argues that the evidence fails to support the existence of the OEL program and that, even if the purported contractual arrangements did exist, they were shams without economic substance, we first address his argument that "even if the Court accepted petitioner's claims that he was actually an employee of TransNational * * * , all amounts * * * [SBE] paid into the OEL arrangement are currently taxable to petitioner because he constructively received the payments."[11]

---

[11]As an alternative to his constructive receipt argument, respondent argues that petitioner is taxable on those amounts under the economic benefit doctrine; i.e., "[p]etitioner gained the financial and economic benefit of the OEL funds [placed in the HD Vest account] because, in addition to his use of them to pay personal credit card bills * * *, the funds were * * * set aside for him and were not subject to" SBE, TransNational, or TLCM creditors, the last because TLCM (in whose name the account was opened) "if it existed at all, was a shell."  Respondent also invokes the application of sec. 83 (Property transferred in connection with the performance of services) to the transfers of funds to the HD Vest account, stating that "section 83 all but codifies the economic benefit doctrine in the compensation context" and noting that those funds were "either transferable or not subject to a substantial risk of forfeiture" with the result that they are "includible in petitioner's income when earned by petitioner and 'set aside' by * * * [SBE]."  Because we find
(continued...)

Petitioner rejects the factual premises upon which respondent bases his finding of constructive receipt: (1) Petitioner's ability to direct Messrs. Carstensen and Cafferata with regard to the use of the funds in the account, (2) his ability to terminate the account and retrieve the funds in it at any time, and (3) his unlimited access to those funds by means of the Leadenhall Bank credit cards. In each case, petitioner argues that there is inadequate factual support for respondent's characterization. Petitioner argues that unrelated third parties, not petitioner, owned and controlled the HD Vest account, and that the funds in the account were subject to a substantial risk of forfeiture. Petitioner also argues that his participation in the OEL program is governed by a series of cases in which an individual entertainer, artist, or athlete contracts with a personal service corporation (PSC), which he either controls or in which he has a significant interest, to lease his services to third parties with which he either previously had or could have had a direct relationship (the entertainer, artist, athlete cases). In each case, the Commissioner tried to attribute the PSC's income to the individual, and in each case the court rejected the Commissioner's sham corporation and/or assignment of income arguments, in some cases despite the

---

[11](...continued)
that petitioner was in constructive receipt of the funds in question, we do not address respondent's alternative arguments.

admitted existence of a tax avoidance motive, and respected the separate existence of the PSC for tax purposes.  See <u>Sargent v. Commissioner</u>, 929 F.2d 1252 (8th Cir. 1991), revg. 93 T.C. 572 (1989); <u>Laughton v. Commissioner</u>, 40 B.T.A. 101 (1939), remanded 113 F.2d 103 (9th Cir. 1940); <u>Fox v. Commissioner</u>, 37 B.T.A. 271 (1938); <u>Estate of Cole v. Commissioner</u>, T.C. Memo. 1973-74.

For the reasons set forth in section I.B.2.c., <u>infra</u>, we hold that petitioner was in constructive receipt of and, therefore, understated his income for the audit years by (1) the amount by which SBE's payments to U.S. leasing company that it deducted as "Employee Leasing Program" expenses exceeded (a) the amounts that petitioner received from U.S. leasing company and reported as wages plus (b) the employer portions of the Social Security and Medicare taxes that U.S. leasing company paid with respect to those reported wages (the excess SBE payments), plus (2) the earnings (capital gains and investment income) on the HD Vest account.

###### c.  Application of the Constructive Receipt Doctrine

Under section 451(a), an individual taxpayer, like petitioner, who is on the cash method of accounting must include amounts in gross income in "the taxable year in which received". Section 1.451-2(a), Income Tax Regs., provides in pertinent part:

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his

account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

The evidence clearly and convincingly supports respondent's assertion that petitioner constructively received all of the excess SBE payments in the years in which SBE made those payments. That is because those funds were deposited or were potentially available for deposit in the HD Vest account, which petitioner and Mr. Carstensen, on petitioner's behalf, effectively controlled. Although the HD Vest account was opened in TLCM's name, it is clear that Mr. Cafferata, TLCM's president, and the people in Texas facilitating the movement of funds out of and within the account were merely functionaries whose actions with respect to the account were dictated by petitioner or by Mr. Carstensen on petitioner's behalf. Moreover, because there is no evidence that TLCM, the nominal owner of the account, was other than a shell corporation with no significant creditors, there was no meaningful risk (other than normal market risk) that the assets in the account would become unavailable to petitioner. Petitioner had unrestricted control over what went into the account and unrestricted access to funds placed in the account. He demonstrated the former by unilaterally determining what, if anything went into the account for a given year; and he

demonstrated the latter, i.e., his unfettered access to the funds in the account, not only by directing the investment of funds placed therein, but also, in 2002, by directing that $31,000 be returned to SBE and, beginning in 1998, by using the Leadenhall Bank credit cards for any expenditure, personal or business, he and Mrs. Browning chose to make.  Amounts credited to a brokerage account (which is what the HD Vest account, in essence, was) owned and controlled by the taxpayer are constructively received by him.  See Mendes v. Commissioner, 121 T.C. 308, 313 (2003).

Because the amounts credited to the HD Vest account were "made available [to petitioner] so that he * * * [was able to] draw upon * * * [them] at any time", as required by section 1.451-2(a), Income Tax Regs.--which is all that is necessary for a finding of constructive receipt--we conclude that petitioner constructively received, and was therefore taxable on, all of the money that was transferred (or available for transfer) to that account under the OEL plan (i.e., the excess SBE payments less U.S. leasing company's payment of various fees and health insurance premiums with funds derived from those payments) in the years in which excess SBE payments were so transferred or available for transfer, together with the earnings (capital gains and investment income) accruing on the account in the year(s) of accrual.  Moreover, because the various fees and health insurance premiums that U.S. leasing company paid were paid for

petitioner's benefit, i.e., because those expenditures were an integral part of a program that was designed to provide a tax deferral benefit to petitioner, those amounts also constituted income to petitioner.[12] Presumably, the taxes that U.S. leasing company paid out of SBE's payments to it were the payroll taxes with respect to petitioner's reported wages.

The parties agree that all of the excess SBE payments, less the above-referenced fees, taxes, and health insurance premiums (totaling $163,463 for the 1995-2002 life of the OEL program), were ultimately deposited in the HD Vest account. Therefore, because we find that petitioner constructively received those payments and was also taxable on the above-referenced fees, taxes, and health insurance premiums, we find that petitioner's underpayments for the audit years constituted the tax attributable to (1) the excess SBE payments plus (2) the capital gains and investment income generated by the assets in the HD Vest account.

Our conclusion is unaffected by the entertainer, artist, athlete cases that petitioner relies upon because they are inapposite. In each of those cases, the determinative issue is

---

[12]Petitioner does not argue and, therefore, we do not find that any health insurance premiums paid by U.S. leasing company on petitioner's behalf were excludable from petitioner's income under sec. 106. Moreover, there is nothing in the record as to the amount of any such premium payments. Therefore, we do not reduce petitioner's underpayment by an amount attributable to payments of health insurance premiums on petitioner's behalf.

the viability, for Federal income tax purposes, of the purported employer corporation. We do not rest our conclusion herein on the sham nature of TransNational or U.S. leasing company, but on the fact that petitioner was in constructive receipt of the SBE payments in excess of the amounts he reported as wages, which primarily consisted of funds placed by TransNational in the HD Vest account. Unlike the facts in the entertainer, artist, athlete cases, there was no viable PSC standing between petitioner and the amounts in the HD Vest account.

Because we agree with respondent that petitioner was in constructive receipt of all funds deposited in the HD Vest account, we do not address respondent's additional arguments to the effect that the entire OEL program, including the participation of TransNational, TLCM, and U.S. leasing company, "was a sham completely lacking in economic substance".[13]

---

[13]Respondent's argument that the entire OEL program must be disregarded as solely tax motivated and, therefore, without economic substance is based upon his allegations that (1) petitioner's purported Irish employer did not exist when it supposedly contracted with petitioner to employ him, (2) petitioner never consciously complied with the terms of that alleged contract, nor was such compliance required by his purported employer, (3) petitioner remained president of SBE throughout the audit years, working solely for and holding himself out to all third parties as still in the employ of SBE, and (4) petitioner retained control over and, by means of the Leadenhall Bank credit card, was able to access the funds placed in the HD Vest account. It is only necessary that we sustain (as we have) the last of those allegations in order to find that the amounts deposited in the HD Vest account constituted income to petitioner on the dates of those deposits. The other

(continued...)

### d.  Conclusion

We hold that, for each of the audit years, petitioner's underpayment consisted of the amount of tax attributable to the excess SBE payments plus the earnings (capital gains and investment income) on the HD Vest account.

### 3.  Fraudulent Intent

### a.  Introduction

The second element that we must consider in determining the application of section 6501(c) is petitioner's or Mr.

---

[13](...continued) allegations, even if we were to sustain them, would presumably result in our disregarding TransNational, TLCM, and U.S. leasing company for Federal tax purposes and in findings that (1) petitioner continued in the employ of SBE and (2) it was SBE that, in substance, made the deposits in the HD Vest account. But unless we were to find, as we have, that petitioner was taxable on those deposits when made, the deemed arrangement involving only SBE might very well have constituted the equivalent of a so-called rabbi trust whereby the Commissioner permits an employer to place a portion of the employee's salary in an irrevocable trust (the assets of which remain subject to claims of the employer's creditors) on a tax-free (to the employee) basis.  See Rev. Proc. 92-64, 1992-2 C.B. 422; G.C.M. 39230 (Jan. 20, 1984).  In that event, respondent's quarrel would have been with SBE's deduction of the deposits when made because a rabbi trust, which is in essence a grantor trust, is merely a set-aside of funds by the grantor/employer who is entitled to deductions only as the funds are distributed or made available to the beneficiary/employee.  See, e.g., sec. 671; Accardi v. IT Litig. Trust (In re IT Group, Inc.), 448 F.3d 661, 665 (3d Cir. 2006).  SBE's deduction of its payments to U.S. leasing company for deposit in the HD Vest account for the years in which those payments were made is not at issue herein.

Carstensen's[14] state of mind; to wit, whether either intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. See, e.g., Recklitis v. Commissioner, 91 T.C. at 909. A fraudulent state of mind may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. See, e.g., id. at 910.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. Those badges of

---

[14]As we stated in Allen v. Commissioner, 128 T.C. 37, 40 (2007):

> The statute keys the extension to the fraudulent nature of the return, not to the identity of the perpetrator of the fraud. * * *
>
> *       *       *       *       *       *       *
>
> the special disadvantage to the Commissioner in investigating fraudulent returns is present if the income tax return preparer committed the fraud that caused the taxes on the returns to be understated. Accordingly, taking into account our obligation to construe statutes of limitation strictly in favor of the Government, we conclude that the limitations period for assessing * * * [the taxpayer's] taxes is extended if the taxes were understated due to fraud of the preparer.

In Allen, we specifically noted that the Commissioner was "seeking to collect only the deficiency in tax from * * * [the taxpayer]" and was "not asserting the fraud penalty", thus implying that collection of the latter after expiration of the 3-year limitations period on assessments would depend upon proof of the taxpayer's, not merely the preparer's, fraud. That also appears to be the Commissioner's position. See Field Service Advisory 200126019 (Mar. 30, 2001).

fraud include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) an intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash. See Spies v. United States, 317 U.S. 492, 499 (1943); Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, supra at 910. Although no single factor is necessarily sufficient to establish fraud, a combination of factors is more likely to constitute persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. A taxpayer's intelligence, education, and tax expertise are also relevant for purposes of determining fraudulent intent. See Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Iley v. Commissioner, 19 T.C. 631, 635 (1952).

b.  Discussion

(1)  Introduction

For the 1998-2000 audit years, there exist at least four indicia of fraud, all of which relate to the establishment and use of the Leadenhall Bank account and credit cards:  (1) Concealment of assets, (2) intent to mislead, (3) lack of credibility of petitioner's and Mr. Carstensen's testimony, and (4) intentional understatement of income.  We shall consider each in turn.

(2)  Concealing the Existence of the Leadenhall Bank Account and Associated Credit Cards

As noted supra, on line 7a of Schedule B of petitioner's 1998-2000 returns, petitioner answered "no" to the question asking whether at any time during the taxable year he had "an interest in or a signature or other authority over a financial account * * * such as a bank account" in a foreign country.

Petitioner testified that he did, in fact, check "no" on line 7a, and he defended that answer on the ground that he did not have signature authority over the Leadenhall Bank account associated with his and Mrs. Browning's use of the Leadenhall Bank credit cards, and on the further ground that "it was never * * * [his] intent to hide that money that was down there"; i.e., in the Bahamas bank account.  Mr. Carstensen testified that he merely followed his tax preparation software, which automatically

defaulted to a "no" answer, and that he never considered whether that response was correct. He further testified that he still believed that "no" was the correct answer to line 7a because petitioner lacked "control" over the account.

We find the testimony of both men to be incredible. Line 7a plainly asks whether the taxpayer has "an interest in * * * or other [than signature] authority over a [foreign] financial account * * * such as a bank account". It is inconceivable that either petitioner, a college graduate with a successful business background, or Mr. Carstensen, an experienced tax return preparer and business consultant, could misinterpret or, in Mr. Carstensen's case, ignore that language. Moreover, the notion that petitioner lacked control over the Leadenhall Bank account is patently unsupportable in the light of: (1) The certainty that Mr. Cafferata would respond to petitioner's directions to move funds from the HD Vest account to that bank account as necessary to cover petitioner's and Mrs. Browning's credit card charges and (2) petitioner's unrestricted ability to obtain funds from the account, for any purpose, by use of his credit card.

Direct evidence of an intent to conceal the existence of the Leadenhall Bank credit cards is furnished by petitioner and Mr. Carstensen's response to Ms. Evans' IDR dated June 19, 2002, requesting a list of "all credit * * * cards, foreign or domestic, under any name" used by petitioner "for any purpose,

including personal or business use, during the [audit] years". That response consisted of a credit report that listed credit cards issued under petitioner's Social Security number, which did not include the Leadenhall Bank credit cards. The language of Ms. Evans' IDR clearly encompasses the Leadenhall Bank credit cards. Therefore, we conclude that petitioner's and Mr. Carstensen's failure to include those cards in their response to Ms. Evans' IDR constitutes clear and convincing evidence of their attempt to conceal the cards' existence.

### (3) Intent To Mislead the Revenue Agent

The incomplete answer to Ms. Evans' June 19, 2002, IDR also furnishes clear and convincing evidence of an intent to mislead Ms. Evans regarding the existence of the Leadenhall Bank credit cards. Moreover, Ms. Evans testified that, at her first face-to-face meeting with Mr. Carstensen on August 14, 2002, she again asked him to list all the credit cards that petitioner and Mrs. Browning used during the audit years (at that time, 1999 and 2000) and, again, Mr. Carstensen failed to reveal the existence of the Leadenhall Bank credit cards. It was not until Ms. Evans advised Mr. Carstensen that she was aware of those credit cards that he acknowledged their existence and, for the first time, the existence of the OEL program.

(4) Lack of Credibility of Petitioner's and Mr. Carstensen's Testimony

As discussed supra, we find incredible both petitioner's and Mr. Carstensen's testimony that they believed a "no" answer to line 7a of petitioner's 1998-2000 returns was proper.

We find equally incredible petitioner's testimony that he believed he would have to repay TransNational the amounts corresponding to his and Mrs. Browning's personal use of the Leadenhall Bank credit cards. In fact, petitioner never reconciled, for TransNational, his business versus personal charges.[15] Moreover, petitioner, by his own admission at trial, knew that no representative of TransNational would ever require a reconciliation because TransNational had no economic interest in the HD Vest account from which the funds were drawn to pay the

---

[15]Petitioner was apparently unaware of the illusory distinction between his personal and business-related credit card expenditures, assuming that he believed he was participating in a valid employee leasing program. The draft employment contract between petitioner and the Irish company authorized petitioner's use of a credit card for "corporate business expenses". Because, under the OEL program as described to petitioner by Messrs. Schmidt and Drysdale, petitioner was no longer an SBE employee, and because his Irish company employer had no contractual relationship with SBE, the referenced business expenses had to relate to the business of petitioner's Irish company employer. Thus, any of petitioner's credit card expenditures relating to SBE's business must be considered after-tax capital contributions to SBE by petitioner (who still remained a controlling shareholder therein), and all of his credit card expenditures must be considered personal expenditures. As a result, the use of the HD Vest funds to pay the credit card charges would, under the program, constitute a nondeductible use of those funds by petitioner.

Leadenhall Bank credit card charges. Petitioner fully recognized that the money in that account was his money. Petitioner further admitted at trial that had TransNational required him to reimburse the HD Vest account for personal credit card expenditures, the effect would have been like taking money from one of his pockets and placing it in another; i.e., there would be no economic impact on petitioner.

(5) Intentional Understatement of Income

Petitioner believed that a substantial amount of his and Mrs. Browning's Leadenhall Bank credit card charges were for their personal benefit because they were unrelated to SBE's business and that, absent an accounting to TransNational for those expenditures, he would be required to pay taxes thereon. Yet, as of the date of trial, he had never made such an accounting and he had never paid tax on any amount of his and Mrs. Browning's Leadenhall Bank credit card charges.[16]

---

[16]We do not find that the inconsistencies between the 2003 and 2008 analyses of the Brownings' Leadenhall Bank credit card charges regarding the identity of certain charges as being business related or personal constitute evidence that petitioner intentionally understated his income. Petitioner testified that he prepared the 2008 analysis without referring to the 2003 analysis, and the passage of 5 years between the two explains those inconsistencies to our satisfaction. It is not those relatively few inconsistencies, but, rather, it is the sheer volume of the charges that petitioner believed to be personal, his realization that there was no need to make a meaningful accounting of those charges to anyone, and his demonstrated lack
(continued...)

Ms. Evans' testimony regarding her audit meeting with petitioner further indicates that petitioner intended to understate his income by hiding from respondent his and Mrs. Browning's 1998-2000 expenditures of unreported excess SBE payments by means of their personal charges to the Leadenhall Bank credit cards.  That testimony was as follows:

> Q    Okay.  So, Ms. Evans, what was the nature of your conversation with Mr. Browning regarding his use of the Leadenhall credit card?
>
> A    We had asked him if it was his intent to report the deferred compensation when he withdrew it as taxable income, then why didn't he report the amounts of personal charges at that time on his tax return. Mr. Carstensen stated that --
>
> Q    Mr. Carstensen or Mr. Browning?
>
> A    Mr. Carstensen stated that everybody does it. Mr. Browning then stated that this is the standard way of using credit cards.  Mr. Browning then went on to say it's like running a red light or going the speed limit.  You do things you shouldn't while you can.

When asked by counsel whether he had ever told the agents that using the Leadenhall Bank credit card "was like speeding and hoping not to get caught, something to that effect", petitioner responded:  "I have no recollection of that, that doesn't sound like anything I would say."  Thus, petitioner did not deny making

---

[16](...continued)
of any intention of ever paying taxes on the amounts in question that provide the requisite clear and convincing evidence of fraudulent intent.

the statement quoted by Ms. Evans, only that he did not recall making such a statement.

We find Ms. Evans to have been a credible witness and accept her testimony as an accurate description of her conversation with petitioner and Mr. Carstensen.

### c. Conclusion

We have found that, for each of the audit years, petitioner was in constructive receipt of the excess SBE payments, most of which were deposited in the HD Vest account, plus the earnings on that account.[17]  That finding was based upon our preliminary finding that petitioner had unrestricted access to and control over the funds in the HD Vest account, and, therefore, to the SBE excess payments, which funded that account.  He and Mrs. Browning exercised that access by means of the Leadenhall Bank account and credit cards.  That account and those credit cards were, in effect, the spigot through which the SBE excess payments flowed (via the HD Vest account) to petitioner.  Petitioner knew that, to the extent he was able to access those funds (particularly for what he knew to be personal purposes), he was taxable on them.  We surmise that it was for that reason that he (and Mr. Carstensen) intentionally hid from respondent his means of access

---

[17]As we noted supra, amounts that U.S. leasing company did not deposit in the HD Vest account it spent on petitioner's behalf and, therefore, those amounts also were constructively received by him.

to the excess SBE payments during 1998-2000.  Thus, the evidence clearly and convincingly demonstrates that both petitioner and Mr. Carstensen intentionally sought to evade tax on all or a portion of the 1998-2000 excess SBE payments.  As a result, 1998-2000 remain open under section 6501(c), and respondent is free to determine deficiencies with respect to any item for those 3 years.  See Lowy v. Commissioner, 288 F.2d at 520; Colestock v. Commissioner, 102 T.C. at 385.

### 4.  Application of Section 6501(c)(1) to 1995-97

#### a.  Introduction

Because the Leadenhall Bank account and credit cards did not exist until 1998, the tax evasion that is evidenced by petitioner's concealment of that account and those credit cards does not pertain to the earlier audit years, 1995-97.  We strongly suspect that had Messrs. Schmidt and Drysdale been able to comply with petitioner's 1996 request for an offshore credit card at the time of that request, the pattern of tax evasion that petitioner and Mr. Carstensen exhibited during 1998-2000 would have been present during 1996 and 1997; i.e., that the restriction of that behavior to 1998-2000 was merely fortuitous. "This Court, however, will not sustain a finding of fraud based upon circumstances which at the most create only suspicion." Katz v. Commissioner, 90 T.C. 1130, 1144 (1988).  Moreover, our suspicion is not reinforced by anything that occurred before 1998

with respect to the then-pending offshore credit card.  Although petitioner testified that having a credit card was a "very important" consideration in his determination of whether to embark upon the OEL program as outlined by Messrs. Schmidt and Drysdale, it was not clear, at that time (December 1995) or, indeed, until the card was issued in 1998, that the charges to the card would be funded by the excess SBE payments via the HD Vest account rather than by petitioner's ostensible Irish employer or directly by SBE, or that those charges would, in significant part, be for personal use.[18]  Petitioner also testified that he made the decision, in 1998, to fund those charges from his ostensible deferred compensation account rather than from SBE because, at that time, SBE was starting to have financial problems and he did not want to further weaken the company.  That testimony indicates that a different credit card funding arrangement might have occurred had the card been issued before 1998 at a time when SBE was profitable and in a stronger financial condition.  Therefore, we must find clear and

---

[18]In fact, the promotional materials that Mr. Schmidt furnished to petitioner and Mr. Carstensen contained the following representation:

> The Irish corporation will pay your business expenses, including providing you with a variety of fringe benefits * * *.  To facilitate the payment of many of these fringe benefits, the company can provide you with a credit card, the charges of which are paid from abroad by the company * * * [Emphasis added.]

convincing evidence of fraud, unrelated to petitioner's contemplated use of an offshore credit card, that existed either throughout the audit years or, specifically, during one or more of the pre-1998 audit years (1995-97).

b. Respondent's Arguments

Respondent argues that "the evidence of fraud is overwhelming." He points to a number of alleged indicia of fraud unrelated to the Leadenhall Bank account and credit cards: (1) The "lack of substance" of the OEL program, (2) petitioner's noncompliance "with any of the terms of the purported contracts", (3) the fact that petitioner's relationship with SBE remained unchanged throughout the period of the OEL program, (4) the fact that the funds representing the allegedly deferred amounts ended up in a U.S. brokerage account under petitioner's control, (5) the fact that petitioner never dealt with anyone known by him to be from Ireland or to be an officer or employee of his alleged Irish company employer, TransNational, and (6) petitioner's inability to produce any evidence of an agreement with TransNational, the company he claimed was always his employer. Respondent also alleges fraud in that petitioner lied in stating that (1) he lacked control over the HD Vest account, (2) he did not know why Mr. Carstensen was chosen to manage that account, and (3) Mr. Cafferata had control over the HD Vest account. Respondent also points to: (1) What he considers petitioner's

incredible testimony regarding his faith in the OEL program as a valid income deferral program, (2) the absence of financial records, contracts, or correspondence with any employees of TransNational, and (3) petitioner's submission of false and misleading answers to Ms. Evans' interrogatories during her audit. Respondent concludes overall:

> As in <u>Foxworthy v. Commissioner</u>, T.C. Memo. 2009-203, the whole scheme was aimed at concealing petitioner's untaxed compensation in a nominee account that he controlled and to which he had access through his advisor Carstensen and through the credit card. * * *

With respect to Mr. Carstensen, respondent cites, as "the most obvious aspect of his fraud", the fact that he knew from Mr. McCarthy's pre-implementation analysis "that the scheme was a sham", and, even without that analysis, that "the OEL scheme lacked substance." Respondent ties Mr. Carstensen to many of the allegedly fraudulent features of petitioner's conduct in concluding that he too acted fraudulently in helping to implement the OEL program and in preparing and signing petitioner's 1995-2000 returns "which he knew to be false, with intent to evade tax."

c. <u>Discussion</u>

We agree with respondent that petitioner's failure to produce copies of actual written agreements to which he, TransNational, and/or the U.S. leasing company were parties, his indifference to the actual terms of any such agreement to which

he was a party, and his effective control over the funds in the HD Vest account, are among the factors indicating that the OEL program lacked economic substance. Respondent's problem is that, even if we were to make that finding, before petitioner's concealment of the Leadenhall Bank account and credit cards, which pertains only to 1998-2000, there is no clear and convincing evidence that any of petitioner's or Mr. Carsenten's actions demonstrated an intent to conceal income and, thereby, evade tax.

On its 1995-97 returns, SBE specifically included as one of its "other deductions" on line 19 "Employee Leasing Program" expenses, and petitioner reported as wages from the various U.S. leasing companies, by name, amounts that were substantially less than SBE's leasing program deductions for those years. Thus, it cannot be said that the existence of some form of leasing program involving both SBE and petitioner and the non-U.S. taxation of a substantial portion of SBE's payments for petitioner's services was intentionally hidden from respondent.

Both petitioner and Mr. Carstensen appeared to believe that the OEL program, as constructed and explained to them by Messrs. Schmidt and Drysdale, would result in the sought-after tax deferral for petitioner. Petitioner trusted Mr. Schmidt and viewed him as the principal architect of the program. Petitioner thought he understood the basics of the program and that it was

being followed, even though he had not read and, therefore, was unfamiliar with (and even indifferent to) the actual terms of the contracts pursuant to which the program was supposed to be implemented.  He testified that his failure to read the contracts was based upon his assumption that Mr. Schmidt would advise him of anything he needed to know.  He also testified that he believed that he was in compliance with the requirements of the program so long as he adhered to any and all requests that Messrs. Schmidt and Drysdale made in connection with the program. That he continued to identify himself to third parties as president and as an employee of SBE exemplifies his indifference to the actual requirements of the OEL program (i.e., to what he characterized as the "small print") and is further proof of the program's lack of economic substance as implemented by petitioner, but it is not proof of fraudulent intent.

Petitioner viewed the HD Vest account as something akin to a pension plan account or IRA that would be available when he needed it.  As in the case of an IRA, petitioner apparently believed he had a right to participate in or even control his investment or risk profile in the account.  Moreover, before his and Mrs. Browning's use of the Leadenhall Bank credit cards, beginning in 1998, there is no clear and convincing evidence that petitioner intended to access the funds in the account; i.e.,

that he intended to treat the account as other than a retirement account.

The record is, at best, ambiguous regarding whether petitioner's answers to Ms. Evans' written interrogatories were purposely misleading or merely reflective of his understanding of what he believed to be a legitimate deferral arrangement the actual details of which, because he viewed them as insignificant, were largely unknown to him. Also, to the extent that respondent sees dishonesty and fraud in petitioner's interrogatory response wherein he states that he could not "control or access the money" in the HD Vest account, or in his response that TransNational "possessed full control and discretion over the account", it is possible that petitioner viewed control as synonymous with signature authority, and because he lacked the latter, he honestly (if unrealistically) believed he also lacked the former.

Petitioner testified that the absence of SBE's financial records, correspondence, etc. for examination by Ms. Evans resulted from their disposal, in 2003, as unnecessary after the sale of SBE's business in 2002. He further testified to his belief that none of those documents was relevant to Ms. Evans' audit. We find no clear and convincing evidence that petitioner's testimony was untrue or intended to be misleading.

Moreover, there is nothing inherently fraudulent in setting up a deferral account in the United States. From petitioner's

standpoint, signatory authority over the HD Vest account by a third party (foreign or domestic) appeared sufficient to justify petitioner's ostensible lack of control and, hence, the sought-after deferral.

Finally, we reject respondent's argument that the OEL program in this case is similar to the OEL program that we held to be fraudulent in Foxworthy, Inc. v. Commissioner, T.C. Memo. 2009-203. In Foxworthy, the money transferred to the offshore deferred compensation account was almost immediately transferred out of that account to other investment accounts in various corporate names but used by the individual taxpayer for his own purposes. The evidence supported our finding that, from the beginning, the individual taxpayer intended to hide those funds from the Commissioner and to use them in furtherance of a number of schemes designed to generate false deductions, all of which actions clearly constituted tax evasion subject to the section 6663 fraud penalty. Petitioner's only activity that may have resembled the individual taxpayer's actions in Foxworthy was his use of the Leadenhall Bank credit card, and that activity did not begin until 1998.[19]

---

[19]Another similarity between Foxworthy, Inc. v. Commissioner, T.C. Memo. 2009-203, and this case is the manner in which the OEL program was launched. In both cases, the program was initiated by a transfer of funds to the Irish "employer" corporation and a reduced salary payment to the taxpayer employee in December of the initial implementation year. In Foxworthy,

(continued...)

As noted supra, Mr. Carstensen, like petitioner, appeared to believe that the OEL program, as implemented by petitioner with his participation, would legitimately accomplish the desired tax deferral. There is nothing in the record to indicate that Mr. Carstensen, although a professional preparer of income tax returns, had any experience in the evaluation of tax deferral schemes or programs. That appears to be why he sought Mr. McCarthy's advice regarding the merits of the OEL program. Respondent argues that, on the basis of Mr. McCarthy's concerns regarding the likelihood of an IRS attack, Mr. Carstensen "knew from the very outset * * * that the scheme was a sham." We disagree. Mr. McCarthy did indeed have concerns that the authorities cited in the promotional materials supplied by Messrs. Schmidt and Drysdale were distinguishable from the OEL program as described in those materials, but those concerns did not amount to a conclusion that the program was a sham that could not withstand IRS scrutiny. Rather, it was a warning that a successful IRS challenge represented a distinct possibility. The

---

[19](...continued)
the individual taxpayer reported, for that entire year, only the wages received from the U.S. leasing company for December. Petitioner reported total wages of $323,887 for the initial year, 1995, of which $150,000 was received from the U.S. leasing company for December. Although that essentially 50-50 split of petitioner's 1995 taxable wage payments between SBE and the U.S. leasing company was obviously unrealistic, it was not as aggressive as reporting no wages from the taxpayer's former employer, for whom he had worked for 11 months during the year, as occurred in Foxworthy.

fact that Mr. Carstensen, in the face of that warning, still chose to rely upon the assurances of Messrs. Schmidt and Drysdale that the program would withstand such a challenge, while perhaps demonstrating poor professional judgment on his part, does not amount to fraud. Similarly, we do not believe that Mr. Carstensen's alleged recalcitrance in responding to Ms. Evans' requests for documents or the minor inconsistencies in his testimony identified by respondent amounted to clear and convincing evidence of fraud applicable to the first 3 years of petitioner's participation in the OEL program.

### d. Conclusion

Respondent has failed to provide clear and convincing evidence that petitioner's 1995-97 returns were fraudulent. Accordingly, the extended limitations period provided in section 6501(c) is inapplicable, and respondent's determinations and adjustments relating to those years are barred.

## II. Application of the Section 6663 Fraud Penalty for 1998-2000

### A. Discussion

We have found that, for each of the audit years, petitioner's underpayment of tax equaled the excess SBE payments plus the capital gains and investment income on the HD Vest account. We have also concluded that petitioner filed fraudulent returns for 1998-2000 attributable to his (and Mr. Carstensen's) concealment of the Leadenhall Bank account and credit cards. We

determined that that concealment, on petitioner's 1998-2000 returns and during the audit of those returns, clearly and convincingly demonstrated that petitioner knew that his and Mrs. Browning's unrestricted access to the 1998-2000 excess SBE payments for any purpose (and, in particular, for personal expenses) was inconsistent with the deferral of the excess SBE payments for those years and was, therefore, a fraudulent attempt to evade tax on those amounts.

Moreover, petitioner has not persuaded us by a preponderance of the evidence that his affirmative attempts to hide the Leadenhall Bank account and credit cards do not justify imposing the section 6663 fraud penalty on the entire amount of the underpayment for each of the 1998-2000 years.  See sec. 6663(b).

We do not find incredible petitioner's testimony that he believed any business-related expenses to be deductible so that it was of no tax consequence that he failed to include the excess SBE payments to be used for business purposes in income.  But we find it more likely that that testimony was part of a contrived, overall explanation designed to falsely justify petitioner's failure to include any portion of the excess SBE payments in income despite his unrestricted access to the entirety of those funds, by means of the Leadenhall Bank credit cards, and his knowledge that that unrestricted access rendered him taxable on those payments for 1998-2000.  That, in an our estimation, is why

he and Mr. Carstensen endeavored to hide the Leadenhall Bank account and credit cards from respondent.

B.  Conclusion

The entire amount of petitioner's underpayment for each of his 1998-2000 years is subject to the section 6663 fraud penalty.

III.  Application of the Section 6662 Accuracy-Related Penalty

Because we have applied the section 6663 fraud penalties to petitioner's total underpayments for 1998-2000, the section 6662 accuracy-related penalties do not apply for those years.  See sec. 6662(b) (flush language).

Decision will be entered

under Rule 155.