# United States Tax Court

T.C. Memo. 2024-84

JEFFREY D. HOYAL AND LORI D. HOYAL,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

CRATER LAKE TRUST, KERI COUVRETTE, TRUSTEE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket Nos. 6791-20, 10830-20.            Filed September 5, 2024.

_____

*Richard C. Gano*, *Kevin R. Oveisi*, and *David J. Warner*, for petitioners.

*Kelley A. Blaine*, *Kimberly L. Clark*, *Janice B. Geier*, *Karen O. Myrick*, *Alex R. Halverson*, *Caitlin A. Homewood*, and *Brittany M. Reid*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, *Judge*: The Hoyals participated in a direct-mail subscription business for approximately two decades. The subscription business consisted of several related entities. The Hoyals and their related entities filed returns for 2012 and 2013 (years in issue). More than three years after the filings, the Commissioner issued Notices of Deficiency to the Hoyals and Crater Lake Trust (petitioners) for the years in issue. Petitioners argue that the Commissioner's determinations are barred by the statute of limitations.

**[\*2]** Under section 6501,[1] the Commissioner generally has three years from the time a return is filed to assess tax. However, that period extends indefinitely if a taxpayer files a false or fraudulent return. A return is fraudulent if the Commissioner proves by clear and convincing evidence that a false or fraudulent return was filed with the intent to evade tax. Fraudulent intent can be inferred from the existence of indicia or "badges" of fraud.

The Commissioner has failed to establish by clear and convincing evidence that the returns for the years in issue were filed with the intent to evade tax. Therefore, the Commissioner's determinations against petitioners are barred by the statute of limitations.

FINDINGS OF FACT

I.     *Mr. Hoyal's Business Background*

Mr. Hoyal is highly educated. He earned a bachelor's degree in business administration in 1988 and a master of science degree in business in 1990. Along the way, he also attended law school and earned an LL.M. in taxation from St. Thomas University in Miami. In the early 2000s, Mr. Hoyal pursued a Ph.D., spending six years working on a dissertation about consumer advertising, but he did not complete it.

Mr. Hoyal has extensive experience in running businesses. In the mid-1990s, he began operating Hoyal Farms, an S corporation jointly owned by the Hoyals. Around that same time, he also started a management consulting practice.[2] Mr. Hoyal provided his consulting services through Hoyal & Associates, Inc. (H&A), an S corporation also jointly owned by the Hoyals.[3] But his most relevant business experience was his involvement in a mail-order subscription business. He was involved in that subscription business for approximately two decades.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar

[2] Mr. Hoyal described business management consulting as managing companies and people's activities. In the early years of his consulting practice, he also represented that he could assist clients with tax planning.

[3] Mr. Hoyal formed Hoyal & Associates in the early 1990s as a sole proprietorship and incorporated it as Hoyal & Associates, Inc., in 2008.

[*3] II.     *The Subscription Business*

"The subscription business" was a catch-all phrase used by Mr. Hoyal and Dennis Simpson[4] to describe a third-party, direct mail subscription business that they operated from the mid-1990s to 2015. Mr. Hoyal became involved in the subscription business in the late 1990s by providing consulting services to subscription businesses operated by Mr. Simpson. During the years in issue, Mr. Hoyal and Mr. Simpson operated the subscription business as partners.

A.     *General Structure of the Subscription Business*

The subscription business had three major components that worked together cohesively: (1) mailing agents, (2) clearing entities, and (3) call centers. Mailing agents sent subscription requests, i.e., mailers, to customers across the United States. The mailers offered the customer a set price to subscribe or renew a subscription to a publication. When customers received mailers, they generally had three options: (1) accept the offer to subscribe to the periodical by sending back to the mailing agent a completed mailer and a form of payment; (2) call the number on the mailer to inquire about the subscription; or (3) do nothing and thereby decline the offer to subscribe. During the years in issue, the primary mailing agent was Liberty Publishers Service, Inc. (Liberty).[5]

The clearing entities submitted customer orders. If a customer accepted the offer provided in the mailer, thereby placing an order, the order was forwarded to a clearing entity for processing. The clearing entity processed the order by submitting the order and remitting payment to the publisher or other third-party clearing entity. Once the order was submitted, a publisher had the authority to accept or reject it. As with mailing agents, there were several clearing entities.

The last major component of the subscription business involved call centers. While they had many roles, they primarily handled customer complaints and inquiries related to the mailers. Call centers also processed orders placed in response to mailers. This included

---

[4] Mr. Simpson is a party at issue in related cases. *See* Docket Nos. 17749-21, 17771-21.

[5] Other relevant mailing agents included Orbital Publishing Group, Inc., and United Publisher's Exchange, Inc. These mailing agents, including Liberty, were owned by Henry Cricket Group, LLC (Henry Cricket).

[*4] processing telephone and internet orders and payments made by customers.

### B. *Entities Involved in the Subscription Business*

Mr. Hoyal and Mr. Simpson operated the subscription business through multiple related entities. They formed the entities to provide specific services, which mainly included acting as mailing agents, clearing entities, call centers, or payment distributors. They also formed entities to hold specific assets. During the years in issue, relevant entities included Maximillian, Inc. (Maximillian), Breeze Enterprises, LLC (Breeze), and Crater Lake Trust.

#### 1. *Maximillian*

Maximillian was an Oregon corporation organized on November 21, 2006, by (or on behalf of) Noel Parducci. Ms. Parducci was its nominal president and secretary. While on paper Ms. Parducci seemingly controlled Maximillian, in reality she was subordinate to Mr. Hoyal and Mr. Simpson, who directed the actions to be taken through the entity.

Maximillian had a vital role in the subscription business. Its responsibilities included tracking the financial operations of the subscription business, coordinating the flow of funds among the various entities, and disbursing profits to Mr. Hoyal and Mr. Simpson, mainly through their entities H&A and Reality Kats, LLC (Reality Kats), a limited liability company wholly owned by Mr. Simpson.[6] In 2014, Maximillian memorialized a consulting agreement with H&A that required H&A to provide consulting services to Maximillian. The consulting agreement had an "as of" date of January 1, 2012, but was not actually signed until 2014 for the purpose of showing the Internal Revenue Service (IRS) the intended flow of money.

#### 2. *Breeze*

Breeze, a Wyoming limited liability company, was formed on January 27, 2005, by Joseph Petrucelli. At its inception, Breeze was treated as a partnership for federal tax purposes. During the years in issue, however, Crater Lake Trust wholly owned Breeze and reported

---

[6] Documents in the record contain a variety of spellings of Reality Kats. We make no finding as to which is the "correct" spelling, but we will follow the predominant spelling in the contemporaneous records.

**[*5]** it on Schedules C, Profit or Loss From Business, filed with its returns.

Breeze managed other companies in the subscription business. In 2005, Breeze entered into two consulting agreements to provide financial services, accounting services, and strategic business planning, among other services. The first agreement was with Mail Industries, and the second was with Mail Industries, Inc., the successor of Mail Industries. The consulting agreement with Mail Industries was dated January 27, 2005, but the copy in the record has a fax stamp date of May 3, 2006. It was signed by Mr. Petrucelli, as attorney for Breeze, and Mrs. Hoyal, as president of Mail Industries. The consulting agreement with Mail Industries, Inc., had similar discrepancies. It was dated April 1, 2005, but the copy in the record also has a fax date of May 3, 2006. It was also signed by both Mr. Petrucelli and Mrs. Hoyal. Years later, Breeze entered into a consulting agreement with H&A. This agreement was dated January 1, 2012. H&A was the only client of Breeze during the years in issue.

In addition to providing management services, Breeze purported to own a major asset of the subscription business, a customer profiling system. The profiling system was used to identify "consumers based on the publications to which they already subscribed and using data about human behavior to predict which types of consumers are more likely to place an order to renew or subscribe to another magazine." Mr. Hoyal created the profiling system as an outgrowth of his Ph.D. research. Breeze provided H&A with the use of the profiling system.

3.    *Crater Lake Trust*

Crater Lake Trust was an irrevocable trust formed in 2005 by the Hoyals. Joseph Petrucelli drafted Crater Lake Trust's trust agreement (Trust Agreement).[7] While the Trust Agreement was signed by the Hoyals with an execution date of January 5, 2005, it was not fully executed until later that year.[8] The Trust Agreement provided that Dawna Hoyal, Mr. Hoyal's mother, was the sole beneficiary of Crater

---

[7] There are three versions of Crater Lake Trust's trust agreement in the record; however, only one was properly executed.

[8] At trial, Mr. Hoyal agreed that the trust agreement could not have been executed on January 5, 2005. He further stated that in signing the agreement with an incorrect execution date, he was told by Mr. Petrucelli that the date they signed the agreement was irrelevant; rather, it was the effective date of the agreement and how it was going to be operated that mattered.

[*6] Lake Trust during the lifetime of the Hoyals. However, at their death, the Hoyals' two children would become the beneficiaries. Mr. Hoyal was the trustee of Crater Lake Trust initially and during the years in issue.

### a. *Joseph Petrucelli*

Mr. Petrucelli is the managing partner of the San Diego office of Adkisson Pitet, LLP. He has a law degree from California Western School of Law and an LL.M. in taxation from the University of San Diego Law School. Mr. Petrucelli has over 25 years of experience as a tax and estate planning attorney. He has published articles on private annuity agreements and a book about private annuity trusts.

Mr. Petrucelli was referred to the Hoyals to help them with estate planning and asset protection. The Hoyals engaged Mr. Petrucelli with the goal of establishing a trust and private annuity arrangement by the end of 2005. On or around October 19, 2005, Mr. Petrucelli sent the Hoyals an engagement letter for his legal services. Those services included (1) drafting an irrevocable trust agreement with appropriate grantor trust provisions; (2) drafting a consulting/management/services agreement between the management company and operating entities; (3) drafting a unit purchase agreement between the Hoyals and the nongrantor trust which would include private annuity terms; (4) drafting an amended operating agreement for the management company; (5) drafting a purchase and sale agreement by and between the Hoyals and the grantor trust which would include private annuity terms; and (6) obtaining actuarial certificates for private annuity calculations. Mr. Petrucelli did not receive any interest in any of the entities owned by Mr. Hoyal (or Mr. Simpson) or in their trusts in exchange for his legal services.

### b. *Agreements Entered Into During the Formation of Crater Lake Trust*

As part of the formation of Crater Lake Trust, the Hoyals executed a Private Annuity Agreement between themselves and Crater Lake Trust. The Private Annuity Agreement had an execution date of February 1, 2005. Like the Trust Agreement's, the Private Annuity Agreement's execution date was incorrect. The Private Annuity Agreement designated the Hoyals as annuitants for the sale of property to Crater Lake Trust. The property sold (Breeze) was assigned a fair market value of $15 million based on reasonable investigation into the

**[\*7]** potential fair market value of the asset transferred. The Private Annuity Agreement provided that the annuity payments to the Hoyals would continue until they both died.

Lastly, in connection with the formation of Crater Lake Trust and the execution of the Private Annuity Agreement, a Unit Purchase Agreement was executed between the Hoyals and Mr. Hoyal as trustee of Crater Lake Trust. The Unit Purchase Agreement was purportedly executed on February 1, 2005, and was meant to be read in connection with the Private Annuity Agreement. It identified the property to be transferred as all of the ownership units of Breeze; however, there were at least two versions of the Unit Purchase Agreement showing different numbers of ownership units (100 or 198 units). The two different versions of the Unit Purchase Agreement were provided to the Commissioner, one during examination and the other during pretrial discovery.

### c.  *TLN, LLC*

TLN, LLC (TLN), was formed in 2005 as a limited liability company and treated as a partnership for federal tax purposes. Mrs. Hoyal and the Hoyals' children, Trent and Nicole Hoyal, held equal interests in TLN. As part of the formation of TLN, the Hoyals sold to TLN real property at 3976 and 3950 Bellinger Lane for $397,925, the stated price in the deed. Until 2011, the real property at 3976 and 3950 Bellinger Lane, Medford, Oregon, consisted of the Hoyals' principal residence and a co-located office. TLN's sole asset was the deed to the real property.

On January 5, 2006, TLN entered into a Unit Purchase Agreement with Crater Lake Trust in which Crater Lake Trust purchased TLN for $795,850.

### C.  *Mr. Hoyal's Role in the Subscription Business*

Mr. Hoyal had a managerial role in the subscription business, providing oversight and direction to all entities involved in the business. While neither he nor Mr. Simpson had direct ownership interests in those entities, Mr. Hoyal believed that they were ultimately responsible for the subscription business regardless of who handled the day-to-day operations. Perhaps more significant than Mr. Hoyal's view is that everyone working within the subscription business viewed Mr. Hoyal and Mr. Simpson as their ultimate bosses.

**[\*8]**  Mr. Hoyal provided his services to the subscription business primarily through H&A, although he sometimes also provided services through Breeze. He was an employee of both during the years in issue. Mr. Simpson, on the other hand, provided his services to the subscription business through Reality Kats.

### D.  *Flow of Services and Payments Between Entities*

The subscription business had a general payment structure that involved entities' paying one another for services they provided to each other and deducting offsetting expenses. But in the making of these payments, money bounced from entity to entity. For example, during the years in issue, Liberty was the main operating entity of the subscription business. Mr. Hoyal provided services to Liberty through his consulting business, H&A. To pay for Mr. Hoyal's services, Liberty would make payments to Henry Crickett, the entity that owned it, and characterize these payments as payments for consulting services. Henry Crickett would then make payments to Maximillian for the consulting services. The money in Maximillian would remain there until Ms. Parducci was instructed to transfer it to H&A (or Reality Kats if the payment was for Mr. Simpson's services). This instruction could be in an email or an invoice. Ms. Parducci would transfer the money as instructed. And Mr. Hoyal would receive payment for his services through H&A (and Mr. Simpson through Reality Kats). During the years in issue, H&A and Reality Kats received roughly equal transfers of money from Maximillian.

In some situations, H&A would also pay management fees to Breeze for consulting services. These transfers purported to be for consulting services provided to H&A as well as for use of the profiling system. Breeze and H&A would pay Mr. Hoyal wages.

Notwithstanding the convoluted movement of funds, each entity that received payments for services reported the amounts received in its gross receipts. Mr. Hoyal also reported the wages he received from Breeze and H&A during the years in issue. Mrs. Hoyal was also an employee of H&A and reported her wages.

### III.  *Tax Returns*

Petitioners and their related entities filed tax returns for the years in issue. Curt Ankerberg prepared these returns.

**[\*9]**    A.    *Mr. Ankerberg's Tax Return Preparation*

Curt Ankerberg, now retired, was a licensed certified public accountant who practiced for 33 years. Mr. Ankerberg worked at several accounting firms throughout his career. He prepared thousands of tax returns, gaining experience in individual returns, corporate returns, partnership returns, and trust returns. Although he prepared trust returns, he considered himself as having specialized in corporate, individual, and partnership returns. He prepared trust returns the least of the various types of returns he prepared. And even then, he mostly prepared returns for simple trusts, which were not technical and complex. But he was familiar with complex trusts and had prepared returns for those types of trusts before meeting the Hoyals.

Mr. Hoyal hired Mr. Ankerberg to prepare tax returns for the subscription business. At the time, Mr. Ankerberg had recently established his own accounting practice. Because of a noncompete agreement with his former accounting firm, he did not have any clients when he began his own accounting practice. To build up a client base, he purchased the address information for 7,000 names and sent out letters to prospective clients. Mr. Hoyal responded to the letter. By the end of 2005, Mr. Ankerberg's practice had already found some success by having Mr. Hoyal and entities related to the subscription business as clients.

Mr. Ankerberg prepared petitioners' tax returns from 2005 through 2013. For his preparation of the returns for the Hoyals and Crater Lake Trust, Mrs. Hoyal provided Mr. Ankerberg with financial statements for all related businesses. After the returns were prepared, Mr. Ankerberg provided draft returns to Mr. Hoyal. Once approved, Mr. Ankerberg finalized the returns and sent them to the Hoyals for signature.

B.    *The 95% Amortization*

During the years in issue, Crater Lake Trust "amortized" as an "application of annuity cost" 95% of the gross receipts of Breeze, its Schedule C activity. Breeze first claimed this 95% amortization on its 2005 return. On that return, it reported $6,302,589 in gross receipts and claimed 95% of that as an amortization deduction.

This 95% amortization is novel. There was much discussion among Mr. Hoyal, Mr. Petrucelli, and Mr. Ankerberg about how to use it. In March 2006, Mr. Ankerberg and Mr. Hoyal held a call with Mr.

[*10] Petrucelli to discuss private annuity trusts. The purpose of the call was for Mr. Petrucelli to provide Mr. Ankerberg with the mechanics of how to prepare a tax return for an annuity trust because of Mr. Ankerberg's unfamiliarity with the concept. Mr. Petrucelli failed to explain to him how the annuity trust worked, but he advised Mr. Ankerberg to use the 95% amortization method on the returns. Mr. Ankerberg continued to use this 95% amortization method for subsequent years.

At trial, Mr. Petrucelli testified that he did not recall any conversations with Mr. Hoyal, Mr. Ankerberg, or Mr. Simpson in which he advised them to use the 95% amortization method. Mr. Petrucelli was not credible.

IV.   *IRS Examination of Petitioners' and Related Entities' Returns*

The Commissioner audited returns of the Hoyals, Crater Lake Trust, Hoyal Farms, H&A, and other entities and individuals involved in the subscription business. During the examination, petitioners were primarily represented by David Lennon. Mr. Lennon, a practicing attorney since 1988, worked as an attorney for the subscription business. Although he is primarily a commercial litigator, he has some tax litigation experience as well. In addition to his other work for the subscription business, Mr. Lennon represented all the entities and individuals that were a part of the subscription business during litigation with the Federal Trade Commission (FTC) over deceptive practices.

A.   *Examination of the Hoyals' Returns*

The revenue agent conducting the examination issued four information document requests (IDRs) to the Hoyals during the examination. The Hoyals responded to each IDR by providing some, but not all, of the requested information. The Commissioner did not issue any additional IDRs to the Hoyals after receiving a response to his fourth request.

B.   *Examination of H&A's Returns*

The revenue agent issued five IDRs and a summons to H&A during the examination. The revenue agent issued the first IDR to H&A to inquire into income and matching expense deductions. The revenue agent wanted H&A to produce information that supported the computation of reported income and expenses on its 2012 return. Mr.

[*11] Lennon, acting as H&A's representative, provided a partial response in which he provided only information he felt was relevant to the examination. The revenue agent issued a second IDR, seeking additional information and specific calculations for a set of invoices to help him understand the services H&A was providing. The revenue agent also emphasized the need for a site visit. Mr. Lennon again provided some, but not all, of the information requested. Among the documents Mr. Lennon provided was a consulting agreement between H&A and Maximillian. Mr. Lennon also informed the revenue agent that H&A did not consent to a site visit. The revenue agent found the response to be insufficient. He found invoices to be vague, containing unhelpful descriptions of services and large round numbers. He expected to see adequate details on the invoices, such as a breakout of what services were provided, when the services were provided, and a time period for performance. He also found the consulting agreement between H&A and Maximillian to be generic rather than specific to the business.

The revenue agent issued a third IDR, requesting information regarding tax year 2013 and seeking, among other items, information regarding the computation of income and claimed expenses. He again emphasized his need to tour the business. Mr. Lennon again provided some, but not all, of the information requested. The documents provided included two separate consulting agreements between Breeze and H&A. The revenue agent found the consulting agreements to lack sufficient detail, such as a description of the metrics used, milestones for performance, and how much of any service was provided at any given time. In his response to the third IDR, Mr. Lennon again rejected the revenue agent's request for a site visit, stating that the revenue agent had already toured the business in connection with the examination for another related entity.

Dissatisfied with the responses, the revenue agent issued a summons to H&A for documents and testimony. He also requested a site visit to H&A facilities. In response, H&A agreed to a site visit and interview. In 2015, the revenue agent conducted a site visit and interviewed Mr. Hoyal in connection with the audit of H&A.

The revenue agent found Mr. Hoyal's interview difficult. He believed that Mr. Hoyal provided inconsistent explanations and made false responses to questions asked. He also noted that during the interview, Mr. Lennon attempted to stop the revenue agent from asking questions about entities other than H&A, although the agent eventually received answers to those questions.

**[\*12]** The revenue agent issued the fourth and fifth IDRs after the interview and site visit. After Mr. Lennon responded to both IDRs, the revenue agent did not issue any others in the audit of H&A's returns for the years in issue.

At no time during the audit of the returns of H&A or any other related entities or individuals was the revenue agent informed by Mr. Lennon, or any of the taxpayers whose returns were under examination, that the consulting agreements between H&A and Maximillian and between H&A and Breeze were not executed on the dates stated in the agreements.

### C.    *Examination of Hoyal Farms' Returns*

The revenue agent issued Hoyal Farms four IDRs during its audit and received a response to each. The revenue agent also issued a summons to Hoyal Farms for certain documents. After receiving a response to the summons, the revenue agent did not request any additional information. The revenue agent also conducted a site visit of Hoyal Farms.

### D.    *Examination of Crater Lake Trust's Returns*

The revenue agent issued five IDRs during the audit of Crater Lake Trust. Mr. Lennon responded to each request other than the fifth. Although he requested additional time to respond to that IDR, he ultimately failed to do so. The revenue agent also issued a summons in connection with the examination of Crater Lake Trust, to which Mr. Ankerberg responded. The revenue agent did not request additional information for the audit of Crater Lake Trust's returns after the summons and the fifth IDR.

At no time during the audits of Crater Lake Trust or other related entities was the revenue agent informed that the Unit Purchase Agreement was revised in 2014.

### E.    *Documents Provided*

During the examination, petitioners and their related entities provided the Commissioner with extensive records. They provided organizational documents. They also provided their accounting records by providing QuickBooks files with general ledgers for various entities. They provided balance sheets, bank records, and receipts. They also provided returns of related entities.

**[*13]** Petitioners (or their advisors) also provided altered or backdated documents. The revenue agent received agreements with stated execution dates that predated the actual execution dates. These agreements included the consulting agreement between Maximillian and H&A, a consulting agreement between Breeze and H&A, and a private annuity agreement between Crater Lake Trust and the Hoyals. Additionally, the revenue agent received more than one version of some documents, including two versions of a unit purchase agreement between Crater Lake Trust and the Hoyals and three versions of the Crater Lake Trust agreement.

## V.     *Penalty Approval*

While assigned to the examination of Crater Lake Trust and associated Hoyal cases, the revenue agent requested from his supervisor approval for assertion of the fraud penalty and, in the alternative, the negligence penalty. The revenue agent's manager approved the fraud penalty and the alternative negligence penalty before the issuance of the Notices of Deficiency.

## VI.     *Notices of Deficiency and Concessions*

On March 20, 2020, the Commissioner issued Notices of Deficiency to petitioners for the years in issue. He determined the following deficiencies and penalties against the Hoyals:

| | | Penalties | |
| --- | --- | --- | --- |
| Year | Deficiency | §6662(a) | §6663 |
| 2012 | $11,511,240 | $121,381 | $8,178,253 |
| 2013 | 5,090,910 | 74,645 | 3,483,248 |

He determined the following deficiencies and penalties for Crater Lake Trust:

[*14]

| Year | Deficiency | §6663 Penalty |
|------|-----------|---------------|
| 2012 | $6,342,991 | $4,757,243 |
| 2013 | 723,893 | 542,920 |

Petitioners timely filed Petitions with the Court. They disputed the Commissioner's determinations and argued that the Commissioner's adjustments in the Notices of Deficiency were barred by the applicable statute of limitations. When the Petitions were filed, the Hoyals resided in Oregon and Crater Lake Trust's principal place of administration was also Oregon.

VII. *Trial*

The Court tried these cases in December 2023. At trial, the Court heard testimony from several witnesses, including Ms. Parducci, Mr. Petrucelli, Mr. Ankerberg, Mr. Lennon, the revenue agent, Mr. Simpson, the Hoyals, and others. We found the testimony of several witnesses helpful in understanding the mechanics and intricacies of the subscription business. We also found testimony from certain witnesses conflicting and not credible. For example, Breeze clearly used the 95% amortization method to amortize gross receipts. But there was conflicting testimony from Mr. Ankerberg, Mr. Petrucelli, and Mr. Hoyal as to who provided the specific advice to use this method. Mr. Ankerberg, whose testimony we found credible, testified that Mr. Petrucelli advised him to use the 95% amortization method on the returns. Mr. Petrucelli, whose testimony we did not find credible, rejected any suggestion that he advised Mr. Hoyal or Mr. Ankerberg to use this amortization method. Furthermore, facts surrounding the preparation and filing of Breeze's 2005 return implied that Mr. Hoyal had a better understanding of the method than he let on. Witness testimony and documentary evidence are unclear as to who advised the use of the amortization method.

Mr. Hoyal is highly educated and an established businessman. His unfamiliarity at trial with events and documents, including tax returns, was inconsistent with other witness testimony regarding how he ran the subscription business. His testimony, at times, was not credible.

Before trial, the parties conceded many issues. After concessions, the following issues remain: (1) whether the periods of limitations to

**[\*15]** assess tax against petitioners expired before the Commissioner issued the Notices of Deficiency; (2) whether the taxable items reported on Crater Lake Trust's returns for the years in issue were accurately reported and should be attributed to the Hoyals; (3) whether H&A accurately deducted business expenses for the years in issue; (4) whether the Hoyals are entitled to an NOL carryforward for 2012; (5) whether petitioners are liable for a section 6663 fraud penalty, or alternatively, a section 6662(a) accuracy-related penalty, for the years in issue; and (6) whether the Hoyals' participation in the operations of Novato Development constituted material participation under section 469.[9]

OPINION

These consolidated cases involve the flow of income between two taxpayers and their related entities for tax years 2012 and 2013. For the years in issue, the Commissioner determined deficiencies, section 6663 civil fraud penalties, and alternatively, section 6662(a) accuracy-related penalties. However, the Commissioner issued Notices of Deficiency more than three years after petitioners filed their returns. Thus, a preliminary issue we must decide is whether the periods of limitations to make assessments against petitioners expired before the Commissioner issued Notices of Deficiency. If the periods had not expired, we must then determine whether the Commissioner's remaining adjustments were valid.

I.   *Statute of Limitations*

Section 6501(a) provides that the Commissioner must generally assess tax within three years after a return is filed. However, if a taxpayer files "a false or fraudulent return with the intent to evade tax, the tax may be assessed . . . at any time." I.R.C. § 6501(c)(1). "Fraud for this purpose is defined as intentional wrongdoing by the taxpayer with

---

[9] We lack jurisdiction over the Commissioner's argument regarding whether petitioners materially participated in the operations of Novato Development. In *GAF Corp. & Subs. v. Commissioner*, 114 T.C. 519 (2000), we held that a Notice of Deficiency based on affected items cannot be issued before the completion of the related partnership-level proceedings. The Commissioner issued a Notice of Final Partnership Administrative Adjustment (FPAA) to Novato Development on December 12, 2019. The earliest that FPAA could become final would be 150 days after issuance. *See* I.R.C. § 6226(a) and (b). Because the Commissioner issued Notices of Deficiency to petitioners involving an affected item before the completion of Novato Development's partnership-level proceeding, we have no jurisdiction over the item.

**[\*16]** the specific purpose of avoiding tax believed to be owed." *Fabian v. Commissioner*, T.C. Memo. 2022-94, at \*25.

The Commissioner issued Notices of Deficiency to petitioners on March 20, 2020, more than three years after the relevant returns were filed. He relies on section 6501(c)(1) to keep the period of limitations open. The Commissioner argues that the periods of limitations to assess income tax due from petitioners for the years in issue have not expired because he has established fraud by clear and convincing evidence. Petitioners disagree, arguing that fraud has not been established, and therefore the periods of limitations have expired.

## II.    *Proof of Fraudulent Return*

The Commissioner must establish fraud by clear and convincing evidence. I.R.C. § 7454(a); Rule 142(b); *Botwinik Bros. of Mass., Inc. v. Commissioner*, 39 T.C. 988, 996 (1963). The existence of fraud is a question of fact to be resolved by considering the entire record. *Clark v. Commissioner*, T.C. Memo. 2021-114, at \*36–37. The determination of fraud for purposes of determining whether a taxpayer filed a fraudulent return under section 6501(c) is the same as the determination of fraud for purposes of the civil fraud penalty under section 6663. *Browning v. Commissioner*, T.C. Memo. 2011-261, 102 T.C.M. (CCH) 460, 467.

To establish fraud, the Commissioner must prove two elements by clear and convincing evidence: (1) an underpayment of tax and (2) fraudulent intent with respect to some portion of that underpayment. *DeVries v. Commissioner*, T.C. Memo. 2011-185, 102 T.C.M. (CCH) 125, 128. The Commissioner satisfies the clear and convincing evidence standard when he provides proof that produces "in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 102 T.C.M. (CCH) 286, 302 (quoting *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 516 (1990)), *aff'd*, 521 F. App'x 476 (6th Cir. 2013). This standard "is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal." *Id.* The Commissioner's burden applies separately for each of the years in issue. *Castillo v. Commissioner*, 84 T.C. 405, 409 (1985). Once fraud is established, the entire taxable year remains open under section 6501(c)(1) even if only a part of the deficiency for a year is attributable to fraud. *Browning*, 102 T.C.M. (CCH) at 467. Likewise, if the Commissioner establishes that part of an underpayment is due to fraud,

**[\*17]** the entire underpayment is treated as attributable to fraud for penalty purposes, except to the extent the taxpayer establishes otherwise. I.R.C. § 6663(b).

### A.    *Fraudulent Intent*

To find fraudulent intent, we must consider whether the return was prepared with intent to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. *DiLeo v. Commissioner*, 96 T.C. 858, 874 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). Because direct evidence of intent to evade tax is rarely available, such intent may be proved by circumstantial evidence and reasonable inferences from facts. *Fabian*, T.C. Memo. 2022-94, at \*26. Courts have developed a nonexclusive list of indicia or "badges" of fraud to describe behavior that may indicate fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992); *Clark*, T.C. Memo. 2021-114, at \*37. The existence of any one indicium is not dispositive, but multiple indicia together are strong circumstantial evidence of fraudulent intent. *Niedringhaus*, 99 T.C. at 211.

Badges of fraud include but are not limited to (1) failing to file tax returns, (2) understating income, (3) maintaining inadequate records, (4) giving implausible or inconsistent explanations of behavior, (5) failing to cooperate with tax authorities, (6) concealing income or assets, (7) engaging in illegal activities, (8) demonstrating a lack of credibility of testimony, (9) filing false documents (including false tax returns), (10) dealing in cash, and (11) an intent to mislead which may be inferred from a pattern of conduct. *Id.*

Most of these badges are neutral or weigh against a finding of fraud in these cases. In considering what facts support the presence of these various badges, we decline to find that a single act supports multiple badges. Therefore, we conclude that the Commissioner has failed to establish that petitioners acted with the requisite fraudulent intent when filing their returns for the years in issue.

### 1.    *Badges Indicating Fraud*

The Commissioner established the following badges of fraud were present.

**[*18]**                 a.     *Lack of Credible Testimony*

Overall, Mr. Hoyal's testimony at trial was not credible. For example, he downplayed his business acumen. He provided conflicting testimony regarding the origin of the 95% amortization method. He also failed to provide sufficient reasoning as to why altered or backdated documents were presented to the revenue agent during the audits without informing him that the documents were not what they purported to be. This conduct supports a finding of fraud for both years in issue.

b.     *Intent to Mislead from Pattern of Conduct*

The Commissioner argues that Mr. Hoyal engaged in two distinct patterns of misleading conduct: (1) collaboration with Mr. Simpson to conceal earnings, and (2) questionable business practices within the subscription business.

Petitioners engaged in a pattern of conduct with an intent to mislead, primarily by providing altered documents to the revenue agent during examination. This conduct shows an intent to mislead and supports a finding of fraud for both years in issue.

We note, however, that the Commissioner cites the altered and backdated documents as support for the existence of conduct described by several badges. Although we believe that the altered documents support a finding of intent to mislead, we decline to use a single act or event to support multiple badges. Therefore, we will address the altered documents only under this specific badge.

2.     *Badges Not Indicating Fraud*

As previously stated, most of the badges are neutral or weigh against a finding of fraud here. By relying on the same facts to establish multiple badges of fraud, the Commissioner has failed to establish the existence of the following badges.

a.     *Failing to File Tax Returns*

Petitioners filed returns for the years in issue. This badge weighs against fraud.

**[\*19]**          b.     *Understating Income*

A pattern of substantially underreporting income over several successive years can be strong evidence of fraudulent intent. *See Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 83 T.C.M. (CCH) 1553, 1560. Such a pattern evidences fraudulent intent "even where the record is 'devoid of the usual indicia of fraud.'" *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at \*48–49 (quoting *Otsuki v. Commissioner*, 53 T.C. 96, 107–08 (1969)), *aff'd*, No. 20-71121, 2022 WL 541617 (9th Cir. Feb. 23, 2022).

The Commissioner's support for this badge is predicated on the Court's adoption of his position that the income of Crater Lake Trust and other entities should be reattributed to the Hoyals. But after the Commissioner's concessions, there were no items of income that were not reported on a timely filed return for petitioners or their related entities. This badge is neutral.

c.     *Maintaining Inadequate Records*

Taxpayers must maintain records sufficient for the Commissioner to determine their tax liability. I.R.C. § 6001. Failing "to keep or produce adequate records to support . . . tax return positions" is an indicator of fraud. *Scott v. Commissioner*, T.C. Memo. 2012-65, 103 T.C.M. (CCH) 1310, 1317. The Commissioner argues that this badge is supported because petitioners "presented documents which were altered (the Unit Purchase Agreement), backdated (the trust agreement [sic] and backdated and created for the audit (the consulting agreements)." Furthermore, he argues that petitioners' records were "persistently inadequate." Petitioners disagree, arguing that they maintained adequate business records for all relevant entities. Specifically, they argue that they "maintained QuickBooks files, financial statements, bank statements, invoices, receipts, and other business documentation for the Hoyals, CLT, Breeze, TLN, H&A, and Hoyal Farms." We disagree with the Commissioner.

Petitioners maintained adequate records. They provided the Commissioner with records that showed the flow of income between petitioners and their related entities. Specifically, they provided (1) QuickBooks ledgers for Hoyal Farms, H&A, and Crater Lake Trust; (2) profit and loss statements for Crater Lake Trust, Breeze, TLN, Hoyal Farms, and H&A; (3) balance sheets, bank records, and bank statements for Crater Lake Trust, Breeze, TLN, Hoyal Farms, and H&A;

**[\*20]** (4) QuickBooks reports, receipts, and other substantiation for specific expense categories for H&A, Hoyal Farms, Crater Lake Trust, and TLN; and (5) tax returns for the Hoyals, Crater Lake Trust and other related entities. While the Commissioner disagrees with how items were reported, petitioners provided enough documentation to reconcile their reporting on their tax returns. This badge weighs against fraud.

d. *Implausible or Inconsistent Explanations of Behavior*

A taxpayer's implausible or inconsistent explanations for his actions may constitute evidence of fraudulent intent. *See Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. "We may consider a taxpayer's filings and testimony as evidence of implausible or inconsistent explanations." *Di Giorgio v. Commissioner*, T.C. Memo. 2023-44, at \*25. The Commissioner argues that petitioners' implausible or inconsistent explanations of behavior include: (1) Mr. Hoyal's claim that he was unfamiliar with tax concepts and that he relied on counsel for tax advice, notwithstanding that he identified himself as someone proficient in tax planning on his business card in the 1990s; (2) providing contradictory statements with respect to certain facts surrounding the Hoyals' association with Crater Lake Trust; (3) providing inconsistent explanations regarding how services were billed in the subscription business; (4) creating backdated documents; and (5) providing inconsistent explanations relating to the services Breeze provided to H&A.

Although petitioners provided seemingly inconsistent or implausible explanations throughout these cases, much can be explained by or attributed to the passage of time. For example, Mr. Hoyal's stating that he relied on counsel for tax advice although he had a business card in the 1990s that said he was tax proficient is not an inconsistency. Although Mr. Hoyal has general tax knowledge, the issues presented here involve private annuities and grantor trusts. Mr. Hoyal's stating that he relied on counsel for help with these unique tax issues despite his general tax knowledge does not establish inconsistency. Similarly, although there are three Crater Lake Trust agreements in the record, only one was actually executed. The Crater Lake Trust agreements that made their way into the record were attachments to emails. And lastly, the Hoyals did not provide inconsistent statements about the services Breeze provided to H&A. They always claimed that those services were consulting or

[*21] management services. We find that the other, minor inconsistencies resulted from the passage of time, with the trial of these cases occurring a decade after the years in issue. Petitioners provided some inconsistent explanations, but we do not find them sufficient to establish fraudulent intent. This badge is neutral.

e.    *Failing to Cooperate with Tax Authorities*

A taxpayer's failure to cooperate with tax authorities, including a failure to cooperate with revenue agents during an examination, can indicate fraudulent intent. *Grosshandler v. Commissioner*, 75 T.C. 1, 19–20 (1980). The Commissioner argues that petitioners failed to cooperate during the examination by (1) not allowing the revenue agent to ask questions about entities other than H&A during an interview, even though the questions dealt with entities controlled by Mr. Hoyal; (2) the Hoyals' producing false or misleading documents; and (3) Mr. Hoyal's knowing of an inaccuracy related to how Scenic Trust (a trust owned by Mr. Simpson) reported an item on its tax return but not informing the revenue agent. Petitioners disagree, arguing that they cooperated with the Commissioner during the entire audit.

Petitioners cooperated during the audit. The Hoyals responded to IDRs issued to them and other related entities, held site visits with the revenue agent, and participated in interviews with the revenue agent regarding their related entities. The Commissioner highlights Mr. Lennon's attempt to prevent the revenue agent from asking particular questions during an interview. But an attorney's attempting to limit the scope of questioning does not rise to the level of lack of cooperation. Furthermore, at trial, the revenue agent stated that he had received the answers to the questions he was asking. The Commissioner also points to Mr. Hoyal's failure to inform the revenue agent about an item reported inaccurately on Scenic Trust's return. Scenic Trust is the petitioner in a related case at Docket No. 17749-21, but it is not at issue in these cases. And at the time of Scenic Trust's audit, Mr. Hoyal was no longer the trustee. His knowledge of the return filing is not relevant to these cases. This badge weighs against a finding of fraud.

f.    *Concealing Income or Assets*

If a taxpayer conceals his ownership of assets or covers up sources of income, such concealment supports a finding of fraud. *Spies v. United States*, 317 U.S. 492, 499 (1943). The Commissioner states that "[t]he record is replete with examples of petitioners' active concealment of facts

**[\*22]** from respondent, and does not require additional elaboration." However, this badge is about whether petitioners took affirmative steps to conceal income and assets, not merely that they did not disclose facts. *See DeVries*, 102 T.C.M. (CCH) at 129. The Commissioner did not produce evidence to show that petitioners concealed income or assets. This badge is neutral.

g.  *Engaging in Illegal Activities*

Engaging in illegal activities, even if the taxpayer is not charged with a crime, is circumstantial evidence of fraud. *Hovind v. Commissioner*, T.C. Memo. 2012-281, at \*54–55. Petitioners argue that this badge generally refers to activities that violate criminal law. And because petitioners have not been convicted of any crimes, they argue that this badge is not satisfied. The Commissioner disagrees, pointing to *Federal Trade Commission v. Adept Management, Inc.*, No. 16-cv-00720, 2019 WL 1746581 (D. Or. Apr. 18, 2019), *aff'd in part, vacated in part sub nom. Federal Trade Commission v. Hoyal Assocs., Inc.*, 859 F. App'x 117 (9th Cir. 2021), a case in which the Hoyals were found to be personally liable for the mail subscription business's violation of the Federal Trade Commission Act. The Commissioner does not explicitly state that this badge is satisfied on the basis of the Hoyals' being found liable for deceptive practices in the FTC case, but we will infer that argument.

Petitioners did not engage in illegal activity that establishes "an attempt to avoid taxes believed to be owing." *Gould v. Commissioner*, 139 T.C. 418, 452 n.34 (2012), *aff'd*, 552 F. App'x 250 (4th Cir. 2014). Generally, we have found this badge to have been satisfied when taxpayers are convicted of a tax-related crime or engage in activities that clearly show "an attempt to avoid taxes believed to be owing." *Id.*; *see Catlett v. Commissioner*, T.C. Memo. 2021-102, at \*19–20. Similarly, we have found this badge to have been met when the unreported income was from an illegal source. *See, e.g.*, *Petzoldt v. Commissioner*, 92 T.C. 661, 701 (1989). The Hoyals' being found liable for deceptive practices in the FTC case has no bearing on these tax cases. It does not support the notion that petitioners engaged in illegal activity or attempted to avoid taxes. This badge is neutral.

h.  *Filing False Documents*

Filing false documents indicates a taxpayer's intent to evade income tax. *See Harrington v. Commissioner*, T.C. Memo. 2021-95,

**[\*23]** at \*40, *aff'd*, No. 22-9000, 2022 WL 17333080 (10th Cir. Nov. 30, 2022). A taxpayer's filing an income tax return that omits income constitutes filing a false document. *Norris v. Commissioner*, T.C. Memo. 2011-161, 102 T.C.M. (CCH) 26, 31. But such a filing alone is not sufficient to satisfy this badge. *Id.*

Petitioners did not file false documents. Even if we assumed that they understated income on their tax returns for the years in issue, that alone is not sufficient to conclude that they filed the returns with the intent to evade income tax. Furthermore, the Commissioner agrees that petitioners did not file false documents. His argument for satisfaction of this badge is that the Hoyals presented to the Commissioner "a plethora of altered, backdated, and fabricated documents" which were "a close cousin" to the badge of filing false documents. We decline the Commissioner's interpretation. This badge weighs against a finding of fraud.

### i. *Dealing in Cash*

Petitioners did not deal in cash. This badge is neutral.

### 3. *Badges of Fraud Conclusion*

After considering the entire record, we find that the Commissioner has failed to provide clear and convincing evidence that petitioners filed fraudulent tax returns. While the Commissioner presented evidence potentially supporting a finding of fraud, specifically, that Mr. Hoyal and others lacked credibility in their testimony and presented altered documents, those actions alone are not sufficient to establish fraudulent intent by clear and convincing evidence. The Commissioner has not carried his burden for establishing fraud.

### B. *Underpayment of Tax*

Because the Commissioner has not established fraud by clear and convincing evidence, we need not determine whether there were underpayments of tax.

## III. *Conclusion*

The Commissioner has failed to provide clear and convincing evidence that petitioners filed false or fraudulent returns for the years in issue with the intent to evade tax. Thus, the extended period of

**[*24]** limitations provided in section 6501(c) does not apply. Accordingly, the Commissioner's determinations and adjustments relating to tax years 2012 and 2013 are barred by the statute of limitations.

To reflect the foregoing,

*Decisions will be entered for petitioners.*